21 N.J. Super. 528 (1952)
91 A.2d 435
ANN REYNOLDS, PETITIONER-APPELLANT,
v.
PUBLIC SERVICE COORDINATED TRANSPORT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 15, 1952.
Decided October 3, 1952.
*529 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
Mr. Louis C. Jacobson argued the cause for the petitioner-appellant.
Mr. Henry Sorenson argued the cause for the defendant-respondent (Mr. David M. Sellick, attorney).
*530 The opinion of the court was delivered by FRANCIS, J.C.C.
The decedent, Patrick Reynolds, was in the employ of Public Service Coordinated Transport as a bus driver. On July 13, 1950, at about 12:30 P.M., during the course of his work and almost immediately following an accident between the bus he was driving and another car, he collapsed and was taken to the hospital. In a few hours he went into a coma and two days later died, the cause of death being a cerebral hemorrhage.
Appellant, the widow of Reynolds, was awarded workmen's compensation in the Department of Labor and the award was reversed in the County Court.
The issue presented is a very narrow one. Was the cerebral hemorrhage caused by the excitement and emotional strain induced by the collision, or, did the hemorrhage preexist, so as to be the cause of the collision rather than the result thereof? There is no serious dispute in the briefs as to the controlling legal principle. If the greater weight of the evidence dictates an affirmative answer to the first alternative, the right to compensation exists. Hall v. Doremus, 114 N.J.L. 47 (Sup. Ct. 1934); Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443 (E. & A. 1942); Geipe, Inc., v. Collett, 172 Md. 165, 190 A. 836, 109 A.L.R. 887 (Ct. App. 1937).
The disparate conclusions reached in the Workmen's Compensation Division and the County Court have led us to make an independent study of the facts.
On July 13, 1950 Reynolds, who was 36 years of age, had been in respondent's employ for three months as a bus driver. The evidence shows that he had been subjected to a pre-employment physical examination; also that, during the 14 years of his married life he had been sick only once and then for three days with a possible appendicitis, which did not actually materialize. On the day of this accident he began work at 4:30 A.M. after a hearty breakfast. He seemed healthy and well and he made no complaints of any kind on leaving home. Some time during his work as a *531 bus driver he had been involved in an accident as a result of which he was suspended for two days, and apparently warned that another such incident would result in loss of employment. The information respecting the warning appears in the hospital record as part of the history given by him on admission. In a case like this where the inquiry is as to whether an admitted accident caused a mental or emotional strain which in turn resulted in the cerebral hemorrhage, such statements occupy the status of symptoms or complaints. In any event the fact of the warning, while a circumstance, is not decisive or controlling; it serves in some measure as an aid to the confirmation of the judgment we believe is required by the proof, whether or not this additional fact is present.
The bus route pursued by Reynolds on this day was largely on Clinton Avenue, between Irvington Center and the Pennsylvania Railroad station in Newark. About 10:15 A.M., after he had gone up and down this route for about six hours, two of respondent's witnesses, also bus drivers, testified they met him in the Irvington bus terminal. The first, William F. Kutter, came upon him in the men's room washing his hands. At this time he rubbed his forehead with his wet hands and said he had a "slight" headache. (After being shown his statement Kutter asked to have the word "slight" eliminated.) He suggested that Reynolds go out to the coffee stand and get something for it. Reynolds went to the stand and obtained something which he drank from a glass. Kutter stood alongside of him, having coffee, but he did not observe either what was in the glass or the color of it. At this time Reynolds told him also that he had a "little accident" on his trip to Newark when a woman fell on his bus. He had helped her to her feet and she said she was all right. After this conversation Reynolds looked at his watch and it being almost 10:20 A.M., the starting time for another trip, he left the terminal.
The second bus driver, Edward J. Doonan, asserted that he encountered Reynolds outside of the lunch counter at *532 about 10:20 or 10:25 A.M., at which time Reynolds again referred to the woman's fall on the bus and to his headache. According to Doonan the headache was described as "splitting." This was the sole coversation between them.
In any event, Reynolds boarded his bus and resumed covering his route. About two hours later he was driving east on Clinton Avenue on one of his regular trips when this collision occurred. It was hot at the time, the temperature then being 83 degrees, and Reynolds was observed to mop his brow a couple of times by a passenger who sat opposite him. However, she saw nothing unusual about his physical condition.
Proceeding east on Clinton Avenue at about 12:20 P.M., he came upon an unusual traffic situation. On the right side of the street a car was double-parked; on the left side two cars were double-parked, one in back of the other. The owner of the second double-parked car had stopped in order to drop off some passengers. After doing this, in order to proceed west, it was necessary for him to back up and pull around the car parked in front of him. Before starting to back he observed the eastbound bus on its right side of the street; he then turned his head to look to the rear and "just started to roll back" when the left front of the bus struck the left front and door of his car. The impact was a "pretty heavy" one and his car was pushed back about 30 feet. After the impact the two vehicles were locked together and they held up traffic on the road.
Respondent produced two bus passengers, neither of whom said there was anything unusual about the manner of operation down to the moment before the accident. The bus was not going fast. One passenger said it went to the wrong side of the road because there was a car double-parked which made it necessary for the driver to swing to the left.
Raymond Walsh, whose car was struck, walked over to the bus driver, who was still sitting behind the wheel, and spoke to him. Reynolds looked stunned and shocked, and made no answer. He remained that way for a few seconds, then *533 got out of his seat, handed out cards to the passengers on the bus and asked them to be witnesses. Following this he alighted and came over to Walsh who was standing at the driver's seat of his car. Reynolds was nervous, excited and shaking all over. They started to exchange licenses and he was dropping the cards and bending down and picking them up. He started to write Walsh's name and address but was unable to finish. A police officer was present at this time and he was talking to both men also, obtaining the facts of the accident. Suddenly Reynolds said he did not feel well, that he had a pain in his head; he became pale and weak and started to collapse. They sat him on the running board; he was perspiring heavily and his skin was cold and clammy, so they wrapped him in a blanket and waited for the ambulance.
On arrival at the hospital an impression diagnosis of brain hemorrhage was made by the admitting physician. At 5 P.M. he was seen by Dr. Franklin Simon, a specialist in internal medicine. A history was obtained from the patient to the effect that he "was greatly excited and shaky while describing the accident to the police, etc.  experienced severe pain over the right eye and then apparently developed left hemiplegia." The doctor looked after him until he died at 2:20 P.M., July 15, 1950. At 9 A.M. on the day of death he noted his then diagnosis of the case as:
"Exact etiology of hemorrhage is of course not determined but my impression is a ruptured aneurysm due to the severe emotional strain  cannot of course rule out an intra-cerebral hemorrhage with subarachnoid extension."
Following the death an autopsy was performed by the assistant medical examiner of Essex County, Dr. Carmine Berardinelli. This examination revealed a condition only discoverable on autopsy, namely, that Reynolds was afflicted with congenital hypoplasia of the arteries, especially the cerebral arteries. This condition comes about from the defective formation or incomplete development of the arteries, *534 as the result of which the arterial walls are thin, the lumen of the arteries small and the arteries are subject to rupture.
The autopsy confirmed the diagnosis of cerebral hemorrhage but ruled out a ruptured aneurysm. In describing the hemorrhage Dr. Berardinelli wrote:
"Massive large hemorrhagic area in right internal capsule breaking into lateral ventricles and surface of right frontal region."
And in setting down the primary cause of death he noted:
"Cerebral hemorrhage (apoplexy) in right quadrilateral space breaking into lateral ventricles and surface of right frontal region."
Dr. Arthur Bernstein, a specialist in internal medicine and cardiovascular diseases was called in to see Reynolds at 8 A.M. on July 14, 1950. After examination he made a diagnosis of "a ruptured aneurysm in the Circle of Willis or a rupture of one of the cerebral vessels with extravasation of blood into the sub-arachnoid space." After having seen the autopsy report his final diagnosis was, "An intra-cerebral hemorrhage in a blood vessel on the right side of the head," or more specifically, "Rupture of an intra-cerebral vessel with final rupture into the lateral ventricles and surface of the right frontal region, which is the sub-arachnoid space."
On being given a hypothetical question containing the facts of the accident and the subsequent incidents, he gave the opinion that "as the result of the accident, the excitement and associated nervousness that occurred, that there was an increase in the blood flow through these hypoplastic cerebral vessels, and as a result of this, the increase in pressure and increased flow, that there was a rupture of one of the vessels in the right side of the head in the quadrilateral space, and this went on eventually to cause death, rupturing into the ventricle and front part of the brain."
Respondent recalled Dr. Berardinelli who in answer to a hypothetical question, which included the statement that Reynolds had complained about a "splitting" headache at about 10 A.M. before the accident, said that the "cerebral *535 accident" took place "while driving the car. He had a cerebral accident in the brain and he lost control of the car. That's my opinion." No reasons or explanation were given for this conclusion.
On being referred again by respondent's counsel to the splitting headache at 10 A.M. and asked "if the case is progressing over a period of time * * * would there be certain manifestations up to the point of final collapse," he answered in the affirmative, and said they would appear as paralysis of the hands and that the layman would notice uncoordination of movements and speech. Later he said in general it would take anywhere from a half hour to two hours for such symptoms to appear. Then he was asked:
"Q. Would it take four hours?
A. It would take more. He would have a blackout."
At one time he said the hemorrhage "occurred during that 10:20 period and increased in time" and finally he agreed with respondent's counsel's statement that he did not know when the hemorrhage occurred.
The deputy director asked the doctor if the excitement from the incident of the fall of a woman in decedent's bus before 10:20 A.M. would cause the hemorrhage. The reply was: "It is my opinion that he had the hemorrhage before the excitement," and a moment later he asserted that "it could be even the day before." And he felt it was not reasonable to suppose that the hemorrhage came about after the passenger's fall in the bus because Reynolds continued to work thereafter.
On cross-examination the doctor said that the congenital weakness in the cerebral arterial walls might cause, and in this case did cause, the rupture because of "an increase in the blood flow and the rise in hypertension." He agreed that any sudden rise in blood pressure would be sufficient to cause a rupture and that an emotional disturbance may cause such a rise. On being asked whether the emotional upset and excitement from the accident would be a reasonable *536 and probable cause of the rupture if it happened after the accident, he said: "Probably, but I can't answer for sure because I didn't examine the patient when he had this condition * * *."
One further medical witness appeared in the case, Dr. Asher Yaguda, a specialist in pathology and internal medicine. He had not examined Reynolds but was shown the autopsy report and called to answer a hypothetical question which contained a reference at one point to the testimony that there had been a complaint of "headache" before the accident, and a reference at another point to the statement about a "splitting headache." In answer the doctor advanced the opinion that the hemorrhage preceded the collision, although he could not say just when it began. The conclusion was based upon three premises: (1) the complaint of "splitting" headache before the accident; (2) the failure to handle the bus at the time of the accident "as an experienced bus driver should" and (3) the hemorrhage began in the right frontal lobe of the brain  the silent area  where it "may produce nothing but a headache for quite a while." He said that the "splitting" headache, spoken of at about 10:20 A.M., indicated that the hemorrhage had already begun spontaneously, had proceeded to the point where it caused a headache, and that the failure of collapse or symptoms of paralysis or lack of coordination and the like to appear before 12:20 P.M. was due to the fact that the hemorrhage had begun in the frontal lobe or "silent area" of the brain. These symptoms did not develop until it broke "through the vital centers of the brain."
In discussing hypoplasia he said that while the condition itself is not progressive, such arterial vessels get weaker and weaker through "wear and tear" as the individual gets older. However, in his judgment it was "far fetched" to conclude that a sudden rise in blood pressure would be sufficient to induce a rupture. "Emotion does not come into the picture. It plays no part in it." Then later he conceded that anything which would produce a rupture of "another blood vessel *537 could produce it here," that a sudden rise in blood pressure "if transmitted that far" could produce it, but that nervousness, upset or fright as the result of an automobile accident would "not necessarily" cause such a rise. It would in "certain individuals" but not in the "average individual."
In analyzing the evidence in the situation presented we look for the "preponderance of probabilities." The compensation claimant carries the burden of demonstrating that such a preponderance favors the hypothesis tendered by him. To sustain a recovery it must appear that the hypothesis proposed is "a probable or more probable hypothesis with reference to the possibility of other hypotheses." Carpenter v. Calco Chemical Division, 4 N.J. Super. 53 (App. Div. 1949); Lohndorf v. Peper Brothers Paint Co., 134 N.J.L. 157 (Sup. Ct. 1946); Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533 (Sup. Ct. 1939).
The decedent was a young man, 36 years of age. He had been in good health for many years down to the date of this automobile mishap. He was unaware of the congenital weakness in his arteries and previously the condition had produced neither illness nor disability. Nor did he know that the wear and tear  the ordinary stresses and strains of everyday life  were gradually bringing about further weakness in the arteries. No one knew the fatal and uncontrovertible fact, discoverable only on autopsy, that he had arteries which were more susceptible to rupture than those of a normal individual and that with advance in age they were becoming progressively weaker and more subject to rupture.
The congenital anomaly of itself does not in any wise militate against the right to compensation. It has long since been the law that an employee neither makes nor is required to make any warranty of physical fitness or of the normality of his bodily structure at the inception of his employment. The employer takes him as he is, subject to all of the weaknesses and infirmities he possesses, even though those deficiencies render him more prone to injury. Sunkimat *538 v. Senger Coal & Ice Corp., 137 N.J.L. 103 (Sup. Ct. 1948).
Reynolds was married and had two children. He had been a bus driver for the respondent for about three months and the evidence shows that such drivers have a probationary employment period of that length. He had been involved in a previous accident and was suspended for two days. It can well be inferred that he was conscious of the possible effect of another accident on the duration of his tenure with respondent. In any event he became involved in the mishap in question after driving for approximately eight hours. And no witness asserts that he drove otherwise than in a normal fashion down to and including the time he had to swing left to avoid the double parked cars on the right side of the road. Almost immediately a chain of symptoms appeared which continued until death occurred.
He appeared shocked and stunned, then reacted normally and apparently in accordance with his employer's instructions. He passed out cards to his passengers in a search for witnesses, then left the bus to engage in the customary formalities of license exchange. The evidence is uncontradicted that at this time he was highly excited, very nervous, and shaky; he fumbled with the cards and dropped them to the street. The collapse followed.
An inescapable conclusion from all of the medical evidence is that excitement and emotional strain can cause a sudden rise in blood pressure, that such a rise may cause a ruptured cerebral artery, and that decedent's infirm arteries were more subject to rupture than those of a normal person. Appellant's medical experts, who were treating physicians as well, say that the cerebral hemorrhage and consequent death did come about through the operation of these factors.
At this point we think the preponderance of probabilities favors the conclusion of causal relation between the collision and the hemorrhage. It remains to consider the evidence relied upon by respondent and the opinions of its experts to the contrary.
*539 As already indicated one of these experts on the basis of the facts recited in a hypothetical question denied that the ruptured artery resulted from the accident and stated that the rupture was prior in point of time. He offered no explanation for these conclusions, but it seems plain that he considered the headache and the hypoplastic arteries the dispositive factors. However, much of the probative force of his testimony is dissipated by an inconsistency in his position. First he said in effect that if the hemorrhage was in being at 10 A.M. symptoms of uncoordination of movements and speech would manifest themselves to a layman and then that they might not appear for from one-half to two hours. But when an inquiry was made as to whether the hemorrhage could have followed the incident of the woman's fall on the bus earlier in the morning, he denied that this could have been the case because if it had occurred then Reynolds would not have been able to operate the bus. Such an opinion cannot be reconciled with the view expressed on the major issue set out in the hypothesis a material part of which was that after the complaint of headache was made decedent had driven the bus for two hours up and down Clinton Avenue, through traffic, taking on and discharging passengers, making change, etc., before the collapse occurred.
The other physician predicated his conclusion of absence of causal connection on the headache, the autopsy findings, and the fact that an experienced driver would not have had the accident. In our judgment it is sheer speculation to conclude from the manner in which this collision occurred that loss of mental and physical coordination through cerebral hemorrhage produced it. Here was a driver confronted with two cars double-parked on each side of the street, with a second car also double-parked behind the first one on the left side of the street. The roadway free for passage of his sizeable bus being thus narrowed, he swung to the left to go through the available space at about the time the rear car of those double-parked on the left began to back up. It is reasonable to suppose that this unexpected action threw off *540 Reynolds' calculations as to distance and course of travel, as the result of which the collision occurred. Whether it happened that way or because of misjudgment of distance, or too sharp a swing to the left, or a failure to see the car that was struck, any one of these explanations is more rational on the facts than the hemorrhage theory. In this connection another fact stands out in sharp focus. If, as contended by respondent, a brain hemorrhage had progressed to the point where it had resulted in such loss of coordination as to permit the bus to get out of decedent's control and thus cause the collision, it seems more than strange that the bus did not collide with the first of these double parked cars rather than the second car.
The headache and the thin arteries revealed at autopsy would appear to be the more decisive factors in the answer. Although there is complete absence of testimony as to when the headache had its inception, the doctor accepts it for his premise that the hemorrhage had already begun at 10:20 A.M. when the headache is said to have been mentioned to a witness. And assuming the bleeding to have been in existence then for some unknown period of time, the absence of symptoms of lack of coordination of movements and speech is charged to the asserted location of the hemorrhage, namely, in the frontal lobe or silent area of the brain. Presumably by silent area is meant a portion apart from the motor areas which control the movements of the body and which, we infer from the record, are on the sides of the brain.
In connection with this phase of the doctor's opinion the autopsy report as to the location and description of the hemorrhage is most significant. It shows plainly that the hemorrhage did not begin in the frontal lobe but extended there in its ultimate seepage. There was a massive hemorrhagic area in the right internal capsule (in the right quadrilateral space) breaking into the lateral ventricles and surface of the right frontal region. This would seem confirmatory of the view of Dr. Arthur Bernstein for appellant that following the accident there was a rupture of one of the *541 vessels on the right side of the head in the quadrilateral space, which went on eventually to cause death, rupturing into the ventricles and front part of the brain.
Therefore the autopsy evidence, which is not discredited in any way, provides more persuasive support for the view that the headache was a coincidental condition, unrelated to the accident or hemorrhage, than for the view that the headache meant an existing hemorrhage.
These considerations lead us to the determination on the whole case that the conclusions of petitioner's medical experts are more consonant with reasonable probability than those advanced by respondent. This means, and we so find, that the evidence preponderates in favor of the "hypothesis tendered" by appellant. Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54, 57 (App. Div. 1950).
Accordingly the judgment of the County Court is reversed and the judgment of the Division of Workmen's Compensation is reinstated.