310 P.2d 1089

Mervin H. MILLER, Claimant-Respondent,

v.

BINGHAM COUNTY, State of Idaho, Employer, and State Insurance Fund, Surety, Defendants-Appellants.

No. 8518.

Supreme Court of Idaho.

May 2, 1957.

Rehearing Denied May 27, 1957.

Graydon W. Smith, Atty. Gen., Glenn A. Coughlan, Asst. Atty. Gen., for appellants.

·Anderson & Beebe, Blackfoot, for respondent.

SMITH, Justice.

It is admitted that respondent on March 25, 1955, at the time of the happening of the event hereinafter described, was engaged in the duties of his employment; also, that some eight hours afterward he evidenced a personal injury which had resulted in violence to the physical structure of his body, in that he had suffered a hemorrhage of a branch of an artery supplying the right cortex of his brain, which produced complete and permanent paralysis of his left arm and left leg.

Respondent, as weed control supervisor of appellant Bingham County, with headquarters at Blackfoot, after attendance to duties pertaining to his employment at Boise, was returning to Blackfoot in a motor vehicle furnished him by his employer. When he had reached a point on the high-

way near King Hill he was subjected to an event in respect to which the Industrial Accident Board found, in accordance with the evidence, as follows:

"Claimant * * * was suddenly and without warning involved in a near collision with another vehicle traveling in the same direction; said other vehicle swerved into the path of claimant's vehicle while said claimant was lawfully attempting to overtake and pass said other vehicle; by sudden and full application of brakes and swerving his vehicle; claimant avoided and narrowly missed striking said other vehicle by a margin of approximately four feet and while both automobiles were traveling at a rate of speed estimated to be fifty miles per hour; said other vehicle, containing several small children, never stopped."

Appellants by their assignments of error contend that the Board erroneously found that respondent received a personal injury caused by an accident arising out of and in the course of his employment.

I.C. sec. 72–201 provides in part:

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it

occurred, causing an injury, as defined in this law." (Emphasis supplied.)

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. * * *."

The described event fulfills certain of the requirements of the statutory definition of an accident, since it was unexpected, undesigned, unlooked for and unforeseen; it happened suddenly, and was connected with the industry, and was definitely located as to time and place where it occurred. However, a further statutory requirement must be met, i. e., such event, to constitute an accident within the purview of the workmen's compensation law, must have caused the personal injury.

The question then, which must be answered is,—did the described event cause respondent's personal injury? I.C. sec. 72–201. The question requires a review of the evidence since it presents the matter of the sufficiency of the evidence to sustain the finding of the Industrial Accident Board. The Board found:

"Claimant, as a direct and proximate result of said sudden, unexpected and unforseen incident and episode, was immediately and seriously frightened and shocked thereby; which said fright and shock was immediately manifested in

claimant by a feeling of weakness, involuntary shaking, chilliness, nausea, the inability except with difficulty to gather his thoughts, and an immediate numbness in his head. These manifestations continued thereafter with somewhat lessening degree until retirement the same evening, but never entirely left him. Several hours after the incident and episode above described and before his retirement, claimant manifested paleness and an extremely tired appearance; he suffered a loss of appetite and experienced a definite difficulty of articulation or a slurring of his speech.

"Upon the happening of said accident, or some time during the period thereafter to about 6:00 A.M., on March 26, 1955, claimant suffered a cerebral vascular accident diagnosed as and found to be a hemorrhage of a branch of the arteries of the brain in the right cerebral cortex, which produced in claimant a complete and permanent paralysis of the left arm and left leg.

"The immediate, direct and precipitating cause of said cerebral vascular accident was the sudden, frightening, unexpected, undesigned and unlooked for accident of the afternoon of March 25, 1955, and the emotional strain, anxiety and nervous tension produced in claimant by the happening thereof;

the shock to claimant's nervous system, which in turn caused the cerebral vascular accident, was sufficiently violent to and did produce the injury to the physical structure of claimant's body as hereinbefore found."

Respondent was diagnosed as having suffered a cerebral vascular accident with paralysis on the left side of his body which included his left arm and left leg. The event of the untoward frightening experience to which respondent was subjected in the near automobile collision was related hypothetically to Dr. Hoge, one of respondent's attending physicians; his testimony on direct examination appears:

"Q. Do you have an opinion as to whether or not that sudden incident which has been related to you caused or probably caused this cerebral vascular accident? A. Well, it certainly could have, and in my opinion, did. * * *

* * * * * *

"A. I will say that many strokes follow emotional upsets and sometimes not immediately but hours after and days after."

On cross examination Dr. Hoge testified:

"A. * * * The most likely diagnosis, that is, type of cerebral vascular accident, would be cerebral hemorrhage, or what they commonly call stroke or apoplexy.

* * * * * *

"A. In my experience most of them come after extreme exertion, physical exertion, or excitement, or anxiety.

*    *    *    *    *    *

"Q. Doctor, is the condition the same in a strain from physical exertion as it is from a sudden fright?

*    *    *    *    *    *

"A. Well, the heart puts more pressure on the blood vessels in either instance.

"Q. So that they would be comparable, would they not? A. Comparable.

*    *    *    *    *    *

"A. * * * in just a few minutes of increased pressure you can get an artery to blow out and leak for hours and hours and hours afterwards, just a little one, maybe.

*    *    *    *    *    *

"A. * * * There may have been preexisting weakness in the vessel. However, an emotional upset would cause an increase of pressure within the vessel and also cause spasm and dilation of the vessel and would predispose to either a stroke or thrombosis. * * *."

Dr. Anderson, appellant's remaining attending physician, testified on direct examination on the basis of the evidence hypothetically stated, including the history of the case which the doctor obtained. His testimony appears in part:

"Q. * * * Do you have an opinion as to what was the probable cause of this stroke? A. * * * It is my opinion that a good probability exists that the progression of the symptoms which finally became recognized as a stroke began shortly after the near accident on the road. * * *

*    *    *    *    *    *

"A. * * * there have been many observations in medical experience where an individual who is predisposed to a cerebral vascular accident seems to have the accident occur during periods of severe physical fatigue or severe emotional fatigue or a severe emotional upset or even less defined words or events. Those things have occurred with sufficient regularity for many neurologists and practitioners to be of the opinion that in predisposed individuals physical and emotional fatigue and physical and emotional strain can be precipitating events, and in my own experience, I have seen a number of cases in which such factors were present at the time of the incident.

"Q. And those factors, are they a probability in this case? A. They are a probability."

The doctor then further stated that in his opinion the hemorrhage probably had occurred before respondent went to sleep the evening of March 25, 1955, after having experienced the untoward frightening experi-

ence during the afternoon of that day. Nothing was elicited from the doctor on cross examination which conflicted with his theories expressed on direct examination.

Dr. Howard, called by appellants, on direct examination stated that he could not make a positive statement as to whether there was a causal connection between respondent's stroke and the emotional strain. However, he recognized the medical theories of such causal connection. On cross examination the doctor testified more positively:

"Q. Then * * * you recognize that there can be a relationship between emotional strain, anxiety, tension, and the happening of a stroke? A. Well, there certainly can be, yes. * * *

    *    *    *    *    *    *

"Q. * * * emotional strain and anxiety can be a precipitating cause? A. I certainly think so, yes. I certainly agree with that."

Dr. Blackburn called by appellants testified hypothetically on direct examination, that in his opinion there was no reasonable factual connection between rspondent's experience on the highway and the subsequent stroke. On cross examination, however, Dr. Blackburn recognized the medical theory as did the other physicians, as follows:

"Q. It is a well-recognized fact * * * that such things as excitement, confusion, restlessness, anxiety

and emotional strain can produce a cerebral vascular accident such as has been described here?

    *    *    *    *    *    *

"A. It is a recognized theory."
The doctor's testimony then assumed a negative character. He stated that in practice he had never seen such cases. Again reverting to the medical theories the doctor recognized that emotional anxiety, tension and fright, by elevating the blood pressure, can be precipitating factors of a stroke.

Dr. Kiefer, called by appellants, stated that in his opinion there was not a causal connection between the experience which respondent had on the highway and his cerebral vascular accident. He then recognized medical theories, as did the other physicians, as applicable to the case by the following testimony on cross examination:

"Q. * * * Now, does emotion, in which term I include fright and the physiological reactions that the human body has to fright, have any effect upon the arteries of the body? A. The [that] causes an increased strain on the vessel wall because of the increased blood pressure.

"Q. Then * * * emotion can be a precipitating factor in a cerebral hemorrhage? A. Yes."
The doctor then stated that with a slow leak an appreciable time could pass before paralysis sets in, such as "a matter of minutes or a very few hours."

The doctors generally recognized that arteriosclerosis, since it causes weakening of blood vessels, is a condition associated with cerebral hemorrhage. Dr. Howard, called by appellants, expressed the opinion that since in respondent's case the presence of some arteriosclerosis was detected, the emotional stress and strain, produced by the untoward frightening event, was a precipitating cause of the cerebral hemorrhage.

The fact that there was no physical contact between respondent and the accident is immaterial; such rule is announced by this Court in Roberts v. Dredge Fund, 71 Idaho 380, 385, 232 P.2d 975, 978, as follows:

"The authorities considering this precise point are uniform in holding there need not be physical contact between the accident and the person to constitute an accidental injury."

In Roberts v. Dredge Fund, supra, Roberts, a dredge employee, was standing outside a metal fence surrounding a power substation, situated about 1000 feet from the dredge, when a power company employee started to replace a burned out fuse, whereupon a short circuit resulted attended by a roar and a fall of fire. The death of the dredge employee occurred from resulting emotional shock, summarized by an attending physician:

"A. * * * I mean a shock to his system by a sudden flash, you might say by a blow to his mind to see this sudden ball of fire. I felt, and I feel now that the cause of his death was hastened by the fact that this shock from the ball of fire which has caused his heart to stop beating from * * * occlusion of a coronary artery * * *."

This Court adopted the following reasoning of the dissenting opinion in the case of Bekeleski v. O. F. Neal Co., 141 Neb. 657, 4 N.W.2d 741, 744, as more worthy of acceptance:

"I am inclined to think that the lawmakers, by the use of the term 'violence to the physical structure of the body,' meant an animate body with a directing brain containing blood, sensitive nerves, fibers and convolutions. The brain is part of the physical structure of the body. Without it there could be no performance of an employee's duties. Accidental violence to the brain and resulting disability may be difficult to prove, but plaintiff was rational before the accident and irrational afterward. Her blood pressure was higher and her pulse more rapid. The pupils of her eyes were dilated and her posture abnormal. She had tremors and was unable to walk in her usual manner, all as properly indicated by the majority opinion, but it seems to me these results of the accident evidence 'violence to the physical structure of the body,' within the meaning of the compensation law."

Also, this Court in Roberts v. Dredge Fund, supra, quoted with approval from the case

of J. Norman Geipe, Inc. v. Collett, 172 Md. 165, 190 A. 836, 109 A.L.R. 887, as follows:

"It is not perceived that there is any fundamental difference in law or in principle between an injury causatively resulting from a blood vessel being cut or crushed and one broken by an artificial distension of that blood vessel from fright, apprehension, or exertion directly and proximately a consequence of an accidental event."

See also the following cases, comparable to the one under consideration here, in each of which an award of compensation was upheld on account of personal injury although there was no personal contact between the accident and the injured employee: Yates v. South Kirby, etc., Collieries, 2 K.B. 538, 3 B.W.C.C. 418; Montgomery v. State Compensation Com'r, 116 W.Va. 44, 178 S.E. 425; Monk v. Charcoal Iron Co., 246 Mich. 193, 224 N.W. 354; Reynolds v. Public Service Coordinated Transport, 21 N.J. Super. 528, 91 A.2d 435; Geipe v. Collett, supra; Church v. Westchester County, 253 App.Div. 859, 1 N.Y.S.2d 581; Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443, 25 A.2d 894, 139 A.L.R. 1465; Charon's Case, 321 Mass. 694, 75 N.E.2d 511; Burlington Mills Corporation v. Hagood, 177 Va. 204, 13 S.E.2d 291; Van Ness v. Borough of Haledon, 45 A.2d 673, 24 N.J. Misc. 29, see also Annotation, 109 A.L.R. 892.

The fact that respondent may have been afflicted with arteriosclerosis which tended to weaken his blood vessels, and that arteriosclerosis is a condition regarded as affiliated with cerebral occlusion also is immaterial.

■ Nothing is contained in the workmen's compensation law that limits its provisions to workmen who, previous to injury, were in sound condition and perfect health; for as stated in McNeil v. Panhandle Lumber Co., 34 Idaho 773, 793, 203 P. 1068, 1075:

"* * * our Compensation Law makes no distinction between * * * healthy and unhealthy employés."

In re Larson, 48 Idaho 136, 279 P. 1087, 1089, appears the following:

"Our statute prescribes no standard of fitness, makes no distinction between the sound and the unsound, which, being true, compensation under the act is not based on an implied warranty of perfect health or immunity from latent or unknown tendencies to disease."

In Taylor v. Federal M. & S. Co., 59 Idaho 183, 81 P.2d 728, 730, is found the following statement:

"A weakened condition or susceptibility to injury does not preclude recovery."

See also Hanson v. Independent School Dist. 11–J, 50 Idaho 81, 294 P. 513; Scar-

borough v. Beardmore, 52 Idaho 180, 12 P.2d 771; Young v. Herrington, 61 Idaho 183, 99 P.2d 441; Hamlin v. University of Idaho, 61 Idaho 570, 104 P.2d 625; Woodbury v. Frank B. Arata Fruit Co., 64 Idaho 227, 130 P.2d 870. See also I.C. secs. 72–323 and 72–311 which forbid separation of preexisting disability or infirmity where the disability caused by the injury is total and permanent.

■ Again returning to the definition of an accidental personal injury set out in I.C. sec. 72–201, an emotional shock, though it be a sudden, untoward and unforeseen event, cannot constitute an accident unless such event causes or is causative of a resulting personal injury. This principle is stated in Geipe v. Collett [172 Md. 165, 190 A. 840], supra, in language as follows:

" * * * an accidental personal injury takes place if the injury be a nervous shock that produces not a mere emotional impulse but a physiological injury as the proximate effect of an unforeseen or unexpected event, which occurs without design in the reasonable performance of the employee's duties. [citations.]"

The evidence, in the case under consideration here, is conflicting in the respect as to whether the sudden, untoward frightening event, to which respondent was subjected, caused or was the causative factor of his personal injury. However, the evidence is not conflicting in the respect that medical theories recognize that frightening episodes and events can and do bring about conditions of physical tension, stress and strain sufficient to cause or constitute the causative factors of cerebral or other vascular accidents in the case of some individuals whose blood vessels may have become somewhat weakened.

■ The evidence, though conflicting, as aforesaid, is substantial and competent, and sustains the finding of the Industrial Accident Board that the sudden frightening event, to which respondent was subjected, caused or was the causative factor in precipitating the personal injury, i. e., the cerebral hemorrhage by which respondent became afflicted within a comparatively short time after the happening of said event; and having caused, or been the causative factor of the injury, such event constituted an accident within the purview of I.C. sec. 72–201 of the Workmen's Compensation Law. The evidence, therefore, is sufficient to sustain the Board's finding that respondent received a personal injury caused by an accident arising out of and in the course of his employment.

Idaho Constitution, Art. V, sec. 9, and I.C. sec. 72–609 limit the jurisdiction of the Supreme Court on appeals from the Industrial Accident Board to a review of questions of law only. Wells v. Potlatch Forests, 67 Idaho 420, 183 P.2d 202; Yanzick v. Sunset Minerals, 75 Idaho 384, 272 P.2d 696; Application of Idaho Hospital Association, 76 Idaho 34, 277 P.2d 287.

It is only in cases where the evidence is not conflicting and not in dispute, that the application of the law to the undisputed facts raises a question of law. Johnston v. A. C. White Lbr. Co., 37 Idaho 617, 217 P. 979; Burchett v. Anaconda Copper Min. Co., 48 Idaho 524, 283 P. 515; Horst v. Southern Idaho Oil Co., 49 Idaho 58, 286 P. 369; Rabideau v. Cramer, 59 Idaho 154, 81 P.2d 403; Howard v. Texas Owyhee Min. & Dev. Co., 62 Idaho 707, 115 P.2d 749. Also, where the findings are absolutely unsupported, they may be reviewed as a matter of law. Bybee v. Idaho Equity Exchange, 57 Idaho 396, 65 P.2d 730; In re Black, 58 Idaho 803, 80 P.2d 24; Paull v. Preston Theatres Corp., 63 Idaho 594, 124 P.2d 562; Benson v. Jarvis, 64 Idaho 107, 127 P.2d 784.

The findings of the Industrial Accident Board, when supported by competent, substantial though conflicting evidence will not be disturbed on appeal. Golay v. Stoddard, 60 Idaho 168, 89 P.2d 1002; Knight v. Younkin, 61 Idaho 612, 105 P.2d 456; Cole v. Fruitland Canning Ass'n, 64 Idaho 505, 134 P.2d 603; Zipse v. Schmidt Bros., 66 Idaho 30, 154 P.2d 171; Herman v. Coeur d'Alene Hardware & Foundry Co., 69 Idaho 423, 208 P.2d 167; McGee v. Koontz, 70 Idaho 507, 223 P.2d 686; Limprecht v. Bybee, 76 Idaho 293, 281 P.2d 1047.

The award of the Industrial Accident Board is affirmed. Costs to respondent.

PORTER and TAYLOR, JJ., concur.

McQUADE, Justice, with whom KEETON, Chief Justice, concurs (dissenting).

Mervin H. Miller, the respondent, was employed by Bingham County, State of Idaho, as weed supervisor, and had been so employed since June, 1952. On the day of the occurrence of the incident for which the respondent received an award of compensation, he had been attending an Idaho Noxious Weed Association meeting at Boise, Idaho. The county commissioners of Bingham County had granted him permission to attend the conference and to use a county-owned pickup as the means of travel.

The testimony of the claimant will serve to portray the incident, which testimony is as follows:

"Q. Now, was there any unusual event or incident which occurred at any time during that trip to Blackfoot? Just yes or no. A. Yes, there was.

"Q. And where did that occur in the course of that journey? A. I would say approximately five miles out of King Hill on Highway—I believe that is 30, isn't it?

"Q. It is the main highway? A. On the main highway between King Hill and Jerome or Twin Falls, in through there.

"Q. Did you pass through Glenns Ferry? A. Yes.

"Q. Did you pass through Bliss? A. Yes.

"Q. That highway? A. Yes.

"Q. At this point, would you just describe in your own words to the Board what took place? A. I was driving along coming home, and there was a car in front of me that passed a truck and another automobile on this highway, and as he got past and drove back into the main line on his regular line of traffic, I turned out to pass him as well as this one truck, and just as I got within about, I'd say, four car-lengths from him he turned directly to the left across the white line in the middle of the highway in front of me.

"Q. Now, were you at that time in the passing lane or in the— A. (interrupting) I was in the passing lane, yes, and the pickup was in the passing gear.

"Q. Were you overtaking the car rapidly or slowly, or in what way? A. Well, I imagine, I woul– say the passing speed was around 50 miles an hour.

"Q. Just describe, then, in your own words—well, I will ask you this first: Did you describe the car that pulled over in front of you that way? A. I didn't in this just now, no.

"Q. That is what I mean. A. It was a blue Plymouth, dark blue Plym-outh, two seats, but one door. I wouldn't want to guess the model of it or year of it because it wasn't a new car. It was, I would say, possibly could have been a '50 or '51, but I don't know for sure.

"Q. Did you observe how many occupants were in the car? A. Yes, two little kiddies, whether they were boys or girls I don't know. Two little kiddies in the front seat with a man driving.

"Q. Now, would you state whether or not the driver of the blue Plymouth gave you any signal of any kind of his intention to change from a direct course on the highway. A. There was no signal given.

"Q. Then would you continue to describe in your own words what took place? A. As he pulled across in front of me I immediately put my foot on the brakes and stopped within about four feet of his car right at the door of his automobile. I will say that just before I stopped the two little kiddies were romping on the front seat and I think they had distracted father's attention, if it was their father, to where he wasn't paying any attention to me because I could see he had his arm out pushing them back on the seat.

"Q. Now, the driver of the Plymouth automobile, did he stop? A. Neither one of us stopped to get out of the car and talk to one another.

"Q. Did he come to a stop at all or did he continue on his way? A. He continued on his way on the left side of the highway.

"Q. Would you just describe to the Board what physical reaction or feelings that you had at this moment when the fellow pulled across in front of you and you came to a stop? A. It frightened me so much that I just didn't know exactly anything, what was going to happen. I couldn't visualize what would happen. If I hadn't had good brakes I would have smashed right in the middle of him and probably killed someone, but the brakes were good and I skidded the car to stop, and it had a lot of sand in the back of it because in this country you carry sand to keep them going in bad weather.

"Q. Now, would you describe the feelings that you had, the physical reactions that you experienced at that time? A. Well, I was so frightened that my stomach seemed to turn over from nervousness. My head, it was just kind of a blank. I couldn't gather my thoughts together very easily, but I could just see those people in that car after I had thought that I was going to hit them, and it scared me so bad that I couldn't hardly do anything. I don't think I could have said a word.

"Q. Did you experience any shaking? A. Yes, my whole body was shaking.

"Q. Would you state whether that was voluntary or involuntary? A. I think it was due to this experience.

"Q. Could you control the shaking at that time? A. No, I couldn't.

"Q. Did you feel ill or nauseated? A. I did. I felt nauseated in my stomach. The muscles in my stomach just tightened up until I felt really nauseated. I had left Boise before I had any dinner, of course, and had an empty stomach.

"Q. Did you experience any headache at that time immediately following? A. It wasn't a headache; just kind of a numbness in my head. I didn't know what it was, couldn't tell you how it was. It was just kind of a, well, my brain just didn't seem to function, but it wasn't exactly a headache, no.

\*    \*    \*    \*    \*    \*

"Q. Did you come directly home? A. I stopped at Bliss and got a sandwich and a cup of coffee because I hadn't had any dinner and felt a little weak from this shock and thought that would help me to get over it.

"Q. As you traveled on home, would you describe how you felt? A. Well, I just had that feeling in my stomach

all the time, nervousness, that I couldn't shake it. It was very unusual because in my business, in my job for the county, I drove, oh, around twenty, twenty-five thousand miles a year and on all kinds of roads and all highways, but I just couldn't shake that feeling.

"Q. Now, about what time, if you recall, did you arrive in Blackfoot, Idaho? A. About five o'clock.

"Q. And where did you first proceed? A. I drove directly to my office, which was in the County Agent's Office in the Post Office building, and from there I went to the J. C. Penney store where my wife works, and then from there home."

Thereafter the record discloses Mr. Miller felt shaky and nervous and still had a nauseated feeling when he met Mrs. Miller. This feeling persisted for several hours. Later that evening, the respondent drove his wife and some friends about five miles west of Blackfoot to Groveland, Idaho, where they had a dinner engagement. The respondent testified that he didn't feel hungry, and ate only part of his dinner. He further disclosed that his voice seemed to be muffled and couldn't manipulate his throat muscles as he usually could, and continued to feel sickness and distress in his stomach.

About 9:30 or 10 o'clock that night, March 25, 1955, the respondent took his wife and friends back to Blackfoot, first proceeding to the home of the friends, and then returned to his own home and went di-

rectly to bed. During the night he slept very soundly, and upon awakening in the morning about 6 o'clock, as was his usual habit, discovered that he was paralyzed in the left extremities and that his speech was slurred. Upon the direction of Dr. Walter G. Hoge, he was immediately removed from his home to the hospital.

Dr. Walter G. Hoge and Dr. L. H. Anderson examined the respondent at the Bingham Memorial Hospital in Blackfoot, Idaho, that morning. Both doctors testified as to a complete paralysis of the extremities on the left side of the respondent, and the Industrial Accident Board made a finding as follows:

"* * * claimant suffered a total disability by complete and permanent paralysis of his left leg and left arm equivalent to the loss by amputation of a leg at the hip and an arm at the shoulder."

No question has been raised or argued concerning the employment of the respondent, but only that there was no accident and there was no causal connection between the incident and the injury. However, the principal assignment of error of the appellant is the Industrial Accident Board erred in finding the claimant suffered a personal injury by accident arising out of and in the course of his employment.

In compensation cases, the claimant must show a personal injury caused by an accident arising out of and in the course of his employment, and has the burden of prov-

ing his case by a preponderance of the evidence. Benson v. Jarvis, 64 Idaho 107, 127 P.2d 784; Jensen v. Bohemian Breweries, Inc., 64 Idaho 679, 683, 135 P.2d 442; Wade v. Pacific Coast Elevator Co., 64 Idaho 176, 129 P.2d 894; Dunn v. Morrison Knudsen, Inc., 74 Idaho 210, 260 P.2d 398. Idaho Code sec. 72–201 provides:

"Right to compensation for injury.— If a workman receives personal injury caused by an accident arising out of and in the course of any employment covered by the Workmen's Compensation Law his employer or the surety shall pay compensation in the amounts and to the person or persons hereinafter specified.

" 'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law.

"The terms 'injury' and 'personal injury,' as the same are used in this law, shall be construed to include only an injury caused by an accident, as above defined, which results in violence to the physical structure of the body. The said terms shall in no case be construed to include an occupational disease in any form and only such non-occupational diseases as result directly from an injury."

In reviewing the proof of the respondent, wherein he had attempted to establish a causal relationship between the incident on the highway and the paralysis, the court is called upon to review the field of workmen's compensation that deals with injury resulting from shock, fright, and other conditions not of traumatic origin. After an examination of the cases, it is apparent the states are divided on this particular type of award. However, in reviewing the cases which award compensation, it appears that there was a direct causal connection in that the injury was immediate, substantial, and obviously connected with the incident. The incident which would form the basis of an "accident" was one which would have tremendous impact upon the nervous system of any person who would be connected therewith or an observer thereof. Yates v. South Kirby, &c. Collieries, Limited, 2 K.B. 538, 3 B.W.C.C. 418, C.A.; Montgomery v. State Compensation Commissioner, 116 W.Va. 44, 178 S.E. 425; Monk v. Charcoal Iron Co., 246 Mich. 193, 224 N.W. 354; Roberts v. Dredge Fund, 71 Idaho 380, 232 P.2d 975; Reynolds v. Public Service Coordinated Transport, 21 N.J.Super. 528, 91 A.2d 435, certification denied 11 N.J. 214, 94 A.2d 215; J. Norman Geipe, Inc. v. Collett, 172 Md. 165, 190 A. 837, 109 A.L.R. 887; Church v. Westchester County, 253 App. Div. 859, 1 N.Y.S.2d 581; Geltman v. Re-

liable Linen Supply Co., 128 N.J.L. 443, 25 A.2d 894; Hall v. Doremus, 114 N.J.L. 47, 175 A. 369; Caron's Case, 321 Mass. 694, 75 N.E.2d 511; Burlington Mills Corporation v. Hagood, 177 Va. 204, 13 S.E.2d 291. Among cases which refused to award compensation are Toth v. Standard Oil Co., 160 Ohio St. 1, 113 N.E.2d 81; Bekeleski v. O. F. Neal Co., 141 Neb. 657, 4 N.W.2d 741, and Lacey v. Washburn & Williams Co., 309 Pa. 574, 164 A. 724.

The claimant, Mervin H. Miller, was the only witness who testified to the facts concerning the events which served to make up the incident. There being no other witnesses or circumstances which would in any way conflict with the statements of the claimant, the conclusion is that all the facts are true and undisputed. In cases where the evidence is not conflicting and not in dispute, an application of law to such undisputed evidence raises strictly a question of law and not one of fact. Howard v. Texas Owyhee M. & D. Co., 62 Idaho 707, 115 P.2d 749; Colson v. Steele, 73 Idaho 348, 252 P.2d 1049.

The events leading up to and including the incident as testified to by the respondent were only events in the course of driving his automobile, and nothing spectacular or of tremendous magnitude occurred, such as is set out in the cases hereinbefore cited, which do make an award for fright, shock, exposure, or other condition not of traumatic origin.

There is nothing in the award made by the Board indicating upon what legal premise they developed the theory that the set of circumstances related by the respondent would be an accident within the terms of our statute. Most certainly the cases awarding compensation do not go as far as the Industrial Accident Board has gone in this instance.

In many cases this court, as well as courts in other jurisdictions, has held that ordinary course of events, happenings of everyday life, the normal deterioration of the body, and many other instances, fail to become the basis upon which to conclude there was an accident. Industrial Commission of Ohio v. O'Malley, 124 Ohio St. 401, 178 N.E. 842.

The principal question to be determined is not the sufficiency of evidence, but rather, does this set of circumstances warrant the conclusion, as a matter of law, that the claimant suffered an accident as hereinbefore defined by the statute of the State of Idaho? It must be remembered that as a general rule Workmen's Compensation funds cannot be used for insurance, but are rather to be used for injuries suffered in an accident arising out of and in the course of employment. It is very interesting to note the testimony of the doctors as to whether there was any causal connection between the accident and the injury, and for that purpose the writer points out the testimony of each doctor.

Dr. Walter G. Hoge, a witness called by the claimant, testified:

"Q. Doctor, can you say whether he had a thrombus or an embolism at that time? A. No, sir, I can't say definitely.

"Q. In other words, as I take it, you would not say which one of those situations he had? A. It is impossible to say with certainty.

"Q. Well, the symptoms are the same, are they not, for thrombosis, embolism and cerebral hemorrhage? A. Yes, sir.

"Q. For that reason, you are not stating, then, which he had? A. I am not stating with certainty."

The doctor further testified:

"Q. I believe you said that going to a meeting could cause tension? A. Yes, an important business meeting; sure."

Dr. Hoge further testified:

"Q. From that state of facts, do you have an opinion as to the cause of the cerebral vascular accident? A. Well, in my opinion, the precipitating cause of the cerebral vascular accident was the tension which the patient had undergone in the preceding hours.

"Q. Now, would there be anything, any particular event in the preceding hours that precipitated it, in your opinion? A. Well, there are two things

in our record there: one, his wife, she told me all this this morning, the morning of the stroke. She said that a driver had run him off the road into the barrel pit and he had been very shaky and excited since that, and also that he had attended an important meeting that evening.

"Q. Well, now, you say the tension of the hours before. Is there any— A. (interrupting) Those are the two incidents.

"Q. That produced tension, is that what you are saying? A. Yes, sir."

Dr. L. H. Anderson was the second doctor to testify for the claimant, and among other things testified that he had a specialty of internal medicine, and had been assigned for about one and one-half years to the function of neurology and psychiatry in a military field hospital in Germany. It is to be especially noted that Dr. Anderson had not examined the claimant, Mr. Miller, prior to March 26, 1955, and therefore was in the same position as all of the other doctors who testified in this case. Dr. Anderson secured his background information from both Mr. Miller and his wife, Laura Miller.

Dr. Anderson stated there is no positive reliable test to differentiate thrombosis from hemorrhage, or thrombosis and hemorrhage from a ruptured aneurysm. He described the claimant's case as one in which such a determination would be diffi-

cult, if not impossible. Dr. Anderson further testified certain features of the claimant's case indicated the stroke was "a progressive thing and possibly a slowly progressive thing."

The witness said Mr. Miller told him he had a similar reaction after a near-accident a number of years before. On that occasion, the claimant was unable to talk for a few minutes, and he felt shaky for about half an hour. Dr. Anderson testified the claimant described a similar shaky feeling, and the symptoms were quite similar, after the incident near King Hill. In this latter instance, Dr. Anderson related, the claimant stopped his pickup at the side of the road for a few minutes and then started home; at this time he noticed a headache on the left side of his head. Claimant told Dr. Anderson he felt a revulsion toward food that evening. Next morning, the headache continued and the skin on the left side of his head felt numb.

The witness testified further Mrs. Miller told him her husband's speech was slurred the night of the dinner, as it would have been if he had been drinking. On the way home after the dinner, the car swerved twice toward the right side of the road. Upon arriving home, the claimant went to bed and fell asleep almost immediately. He was still sleeping soundly the next morning, and had to be awakened. His wife said he "looked terrible"—his skin was a little blue and there was a lot of saliva in his mouth, and Mrs. Miller thought he was dying. However, Dr. Anderson continued, Mr. Miller looked "very bright and clear" in the hospital later that morning. Two days later, it was evident the effects of the stroke were much worse than they first appeared.

Dr. Anderson stated in his opinion Mr. Miller's stroke was a progressive affair which may have begun before the claimant arrived home from his trip. The witness pointed out neither he nor anyone else saw the claimant immediately after the accident, and "We only have Mr. Miller's word for what happened and how it affected him." Dr. Anderson said in his opinion there was a good probability the symptoms began shortly after the incident on the highway.

The next three doctors were called by the defendants. Dr. Richard P. Howard, who has a specialty of internal medicine, testified that he had no opinion as to whether or not there was a causal connection between Miller's stroke and the incident near King Hill, Idaho. He explained an individual may have an underlying disease which becomes so severe as to cause a sudden stroke. In such an instance, weakened blood vessels may rupture and cause cerebral hemorrhage at any time; or a blood vessel may narrow until the blood in it becomes stagnant and clots. Dr. Howard said he believed unquestionably Mr. Miller suffered from arterioscler-

osis, and persons so afflicted may have strokes from hemorrhage or from thrombosis at any time.

Dr. Howard further testified there are factors—which may under certain circumstances be emotional factors—which will hasten the weakening of blood vessels through increased pressure or through spasm of the artery. However, he estimated 60 to 80 per cent of strokes are not in any definite way related to preceding emotional upsets or to preceding physical activity. An emotional upset is largely a subjective matter which cannot be measured by a doctor, particularly after an interval of 12 or 24 hours. In Mr. Miller's case, he said:

"*  *  * he may have been at the stage where he would have developed a blood clot that same night or developed a hemorrhage that same night regardless of if he'd been as peaceful and quiet as he could have possibly been the previous week. You have no way of knowing that, and I don't believe that there is any way that a doctor could assess whether this stroke was related to his emotional upset the preceding day, and certainly there is nothing about his physical condition the preceding day that would have precipitated it. He had no excessive physical activity the preceding night, and the only thing that could have done it would have been an emotional upset. There is no way I can see that a doctor can evaluate, yes or no, whether that emotional upset had anything to do with this stroke or not. On the basis of statistics it would be merely a coincidental thing because we know that the majority of strokes are in no way related to emotional or physical upsets. In one particular individual, I just can't see how a doctor could make a positive statement either way."

Dr. Charles R. Blackburn, a member of the American Board of Internal Medicine, qualified as a specialist in internal medicine:

"*  *  * I would be reluctant to believe that the anxiety produced by this incident was causally—as you say, cause and effect—related with what happened even as a precipitating cause because of the time interval involved and because there is nothing in the evidence to indicate a method by where such changes that might have occurred after such an incident would cause what by far and away must be presumed to have been a clotting in the blood vessels, not a rupture."

Dr. Edward J. Kiefer, a diplomate of the American Board of Neurological Surgeons, in answering a hypothetical question as to whether there was any causal connection between the facts of the purported accident and the subsequent diag-

nosed cerebral vascular accident, answered:

"A. There is no connection."

Therefore it is obvious that the ruling of the Board was on the basis of one doctor's testimony out of five as to the possibility that there was a relationship between the tension of the moment at King Hill and the cerebral vascular hemorrhage that was evident the following morning. It was also noted in the testimony of Dr. L. H. Anderson that the state of facts used by him in arriving at his conclusion was slightly different from all of the other doctors. All of the other doctors presumed the claimant continued on his way immediately after the incident and shortly thereafter stopped for lunch, whereas Dr. Anderson presumed the claimant stopped for a few minutes at the scene of the event and then proceeded directly to his destination, where he arrived about two hours later.

In going over the testimony of all the doctors, it is important to note they testified in effect that everyday living would produce tension. Dr. Hoge testified that attending an important dinner meeting could produce tension sufficient to cause a cerebral vascular hemorrhage to a man of Mr. Miller's age and particular physical condition. This was also confirmed by Drs. Howard, Blackburn, and Kiefer.

No accident occurred within the meaning of the statute, and there is no causal connection between the singular event and the cerebral vascular hemorrhage. There are no cases in the entire United States that can support the contention of the claimant, and the using of the Workmen's Compensation fund as an insurance fund will only serve to defeat the intent and purposes thereof.

The correct evaluation to determine if an accident occurred is set forth in 58 Am. Jur., Workmen's Compensation, sec. 257; p. 758:

"* * * The rule of most general application is that if the employment brings with it no greater risk of injury from the particular danger or peril than that to which persons generally in that locality, whether so employed or not, are exposed, there is no causal connection between the employment and the injury, but that if the employment does bring a greater exposure, and injury results, such injury does arise out of the employment. * * *"

See also 83 A.L.R. 234; 139 A.L.R. 1472.

The award should be reversed.