Donald Dean JACOBS, Appellant,

v.

**BOB ELDRIDGE CONSTRUCTION CO.,**
**Inc., and the Travelers Insurance**
**Company, Respondents.**

No. 24141.

Kansas City Court of Appeals.

Missouri.

June 7, 1965.

Motion for Rehearing or Transfer to Supreme
Court Denied July 15, 1965.

Application to Transfer Denied
Sept. 13, 1965.

**34**

James L. Muller, Kansas City, for appellant.

Jack B. Robertson, Rogers, Field & Gentry, Kansas City, for respondents.

HUNTER, Judge.

This case presents a claim by Donald Dean Jacobs for Workmen's Compensation benefits for injuries arising out of and in the course of his employment alleged to have resulted from an accidental injury on February 22, 1962, caused by slipping and falling upon stepping down onto the track of a crane he was operating. The injury claimed is a herniated intervertebral disc. Jacobs' claim is for temporary total disability through July 19, 1962, for incurred medical expenses of $40.00 and for further medical attention of an undetermined value. His average weekly wage is in excess of $71.25 so that the compensation rate is the maximum of $47.50 per week for temporary total disability. His claim for compensation was filed May 19, 1962, together with a request for special order for medical treatment.

The employer, Bob Eldridge Construction Company, and the insurer, the Travelers Insurance Company denied that claimant sustained an injury by accident arising out of and in the course and scope of his employment and that any disability claimant may have is the result of the alleged accident.

After a hearing, the award of the referee was, "I find and believe from all the credible evidence that the employee, Donald Dean Jacobs, failed to prove that he sustained an accident arising out of his employment as alleged and as required under Section 287.-020, Par. 2, RSMo 1959, and amendments thereto. Compensation therefore must be, and the same is, hereby denied." Upon review, the Industrial Commission of Missouri adopted the referee's findings of fact, rulings, conclusions of law and award of no compensation. Upon appeal, the Circuit Court of Johnson County affirmed the Industrial Commission's Final Award Denying Compensation. This appeal followed.

Appellant's contention on this appeal is that the circuit court erred in affirming the

final award denying compensation because the award is not supported by competent and substantial evidence upon the whole record and is clearly contrary to the overwhelming weight of the evidence. Ancillarily, appellant also charges the commission erred in denying employee's request for additional findings of fact.

■ In order to review the contentions of error it is necessary at the outset to establish the exact basis of the Industrial Commission's award. Section 287.020(2), RSMo 1959, V.A.M.S., provides, "The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury." The statute is to be liberally construed to effectuate its purpose of compensation to employees, and accordingly, the words "at the time" are to be given a reasonably liberal and sensible construction. Smith v. American Car & Foundry Division, A. C. F. Industries, Inc., Mo.App., 368 S.W.2d 515. Since the context of the award does not clearly indicate a different meaning we conclude the referee's finding which the commission adopted was a finding that claimant did not slip and fall while working on the job on February 22, 1962, producing an injury. Such a finding necessarily includes two items, namely, (1) a slip and fall, (2) producing an injury. This is in accord with the referee's summation of his understanding of the issues at the commencement of the hearing in the presence of both counsel.

■ In a Workmen's Compensation case, the duty of the reviewing court is to determine whether the award of the Industrial Commission is supported by competent and substantial evidence on the whole record, but it cannot substitute its own judgment on the evidence for that of the Commission. V.A.M.S., Const. of Missouri, Article V, Sec. 22. Nevertheless, the reviewing court is empowered to decide whether

the Industrial Commission could have reasonably made its findings and reached its results on a consideration of all the evidence before it and should modify, reverse, remand or set aside a decision of the Industrial Commission if it is clearly contrary to the overwhelming weight of the evidence. Corp v. Joplin Cement Company, Mo.Sup., 337 S.W.2d 252; Section 287.490, RSMo 1959, V.A.M.S.

We proceed to examine the record as it appertains to item one—Claimant's allegation that while on the job on February 22, 1962, he slipped and fell upon stepping down onto the track of a crane. The only direct testimony that he did so fall is his own statement to that effect. Claimant's counsel advised the referee near the commencement of the hearing that one of the issues was "his (claimant's) credibility".

Claimant testified that on February 22, 1962, between 10 and 10:30 a. m. while on his job with the Bob Eldridge Construction Company the crane he was to operate to dig ditches wouldn't start. " * * * I noticed that the throttle was not open so it would get fuel, so I climbed down off the counter-balance and went inside the crane and cut the throttle, then I stepped out on the track and as I started to step out on the ground my feet went out from under me, and I fell on my tail. * * *" "Q. What did you land on? A. On my rear end, my tail bone and I lit on the track. * * *" "My feet were in the air and I fell back and I grabbed the track to keep from falling on the ground. * * * Q. What did you do? A. I sat up and looked around and I felt kind of funny falling down like that and I just got up and looked around to see who was looking at me. Q. Were there any other employees there? A. There were quite a few around there, yes. Q. Were they employees from the company? A. Yes, sir. Q. Do you have any idea how many? A. Seven to ten. Q. Was there anybody near you? A. Yes, on the other side of the crane on the northeast corner. Q. Did you observe anybody there when you got up that was looking in

your direction? A. Yes, sir. Q. What did you observe? A. There was a fellow looking at me and laughing. Q. You don't know for sure whether he saw it or not? A. No, but he was looking that direction and laughing. (Eight months later his attorney located the employee who had no memory of witnessing any such incident.) Q. What did you do after you got up? A. I went down on the ground and started working on the crane again. Q. Did you feel any effects immediately? A. Just a hurting in my tail bone where I fell. Q. What did you do from then on as far as working was concerned? A. I went ahead and tried to start the crane. Q. How long a time did you try to start the crane? A. Till four-thirty."

Claimant that day did not say anything to anybody about having fallen although his job superintendent Jim Buck came around later that morning. Claimant rode home from work (some 45 miles taking about one hour) with Jim Buck and several fellow employees that evening in Buck's truck but did not mention any fall or accident to any of them. According to claimant, Buck "blew his stack" when claimant told him he had not gotten much done that day because the crane needed a new fuel pump costing $125.00. "He kept on aggravating me and I told him he could get somebody else and I quit. * * * Q. During this whole ride you never once mentioned to the superintendent that you had this accidental injury? A. No, sir, I never thought no more of it. Q. But your back was stiff when you got out? A. Yes, but there were three of us in the cab and we were all jammed together. Q. Even though your back was stiff you didn't say anything about it? A. No, sir. Q. The only thing you discussed was the work you had done that day or hadn't done? A. He tried to talk me into coming back to work. I had quit and he apologized and tried to get me to come back to work and I almost promised him I would come back Monday, we weren't going to work Friday. Q. But you didn't go back to work? A. No, because he

called me up and laid me off the next day (Friday, because of weather conditions)." Claimant did not tell Buck on the occasion of that call anything at all about his claimed accident.

When claimant got out of Jim Buck's truck he felt a little stiff but "did not realize" he was hurt. When claimant got home he was experiencing stiffness. According to his wife, he was unusually stiff and couldn't take his boots off. She had to help him get his work trousers off. When he got up off the divan he couldn't straighten up. She stated that he told her he had had a fall that day. The next morning (Friday) she had to roll him out of bed and when he went to the bathroom she had to help him off of the stool. When he sat down he couldn't get up, she stated. Nor could he do so Saturday or Sunday. It wasn't so much his back, it was his leg and hip that kept getting worse. He called his attorney, "I believe it was Monday".

According to claimant his reason for not first calling a doctor, although he knew several well, was that he had a pending lawsuit against a Mr. Johnston and thought it might have some bearing on this other case. At his attorney's suggestion that he report his accident to the company he called Jim Buck (date and time unstated) to report it but Buck's reaction to the report was not satisfactory to claimant. At the suggestion of his attorney, on March 5, 1962 he telephoned Kay Adams, an employee in the company's office and reported his injury. She wrote down his report of accident and later filed it with the Industrial Commission.

The report of injury dated March 5, 1962, and signed by Miss Adams on behalf of employer was introduced in evidence and stated in part, " * * * Describe in full how injury occurred: (alleges) Mr. Jacobs went to open throttle on motor, stepped on the track, hit a slick spot and fell down, hurting his back; 25. Has employee returned to work? No (Mr. Jacobs was laid off due to weather conditions, foreman did not know of accident); 30.

Describe injury: Unknown, as Mr. Jacobs did not report this injury until later, he is to see his Dr. and have the Dr. send us a report." Miss Adams told him to see his own doctor, Dr. Wilkinson. On being contacted Dr. Wilkinson told claimant if he wanted to come down to his office and sit around he could. This was not satisfactory to claimant, and he telephoned his attorney to find out who would be a good man to go and see. His attorney recommended Dr. Feierabend. On March 8 he went to see Dr. Feierabend who examined but did not treat him. Claimant's first treatment following this occurrence was in May or June, 1962, by Dr. McCall, a chiropractor. The only other treatment he had was in July, 1962, in the Veterans Hospital.

As to item two—whether claimant was injured as a result of his claimed slip and fall the evidence is both voluminous and complicated by claimant's previous history of back trouble. From birth claimant did not have a "normal" back. He has a congenital back condition in that he has a six lumbar type of vertebra rather than a five type. It is a transitional type of vertebra, partly lumbar and partly sacral. On the left side there is a very large transverse process shaped more like the sacrum and it forms a false joint between the ilium and the sacrum on the left side. These congenital conditions "contribute to a back that is more easily injured than a normal back."

Claimant testified that while in the Army (from December 17, 1945, to January 17, 1946) he was hit in the back with an M-1 rifle, was hospitalized six or nine days; that his legs were numb, paralyzed; that he was given a CDD military discharge and obtained a ten percent disability rating in connection with his back. He had that rating for one year.

He was asked: "Q. They removed this disability rating one year afterward? A. Yes. Q. Did you have any trouble after that with your back? A. Yes, in 1958." On September 10, 1946, (within that one year period) claimant wrote a letter to President Truman stating he had been to Dr. Nigro's (his physician) office and was told his back was in pretty bad shape and that he needed medical attention and had to wear a brace. His letter told President Truman that although he was working at that time he couldn't hold a job because his back was hurting so bad, and was afraid he'd have to quit.

In 1949 Claimant made application for reinstatement of the disability benefits for the claimed reason he had been refused a job at General Motors and at Fisher Body because of the (CDD) discharge and he "either wanted them to give me some medical or take it off so I could get a decent job". In 1949 he went to work full time for Centroplis Transfer and worked there regularly fifty-two weeks a year as an oiler on a crane until 1955. He testified he had no trouble with his back while working there.

On February 1, 1955, while working for Bill Goddard Chevrolet claimant had an automobile collision with E. F. Johnston and three weeks later was hospitalized at Menorah Hospital under the care of the company's physicians Dr. Overesch and Dr. Zuber. He remained in the hospital from February 25, 1955, to March 19, 1955. He filed a Workmen's Compensation claim against Travelers Insurance Company, the insurer herein for a whiplash neck and shoulder injury. The entire hospitalization was for treatment of injuries received in the February 1, 1955 accident and did not involve a back injury.

Claimant continued under the care of Dr. Overesch who in December 1955 referred him to Dr. Revis C. Lewis. Dr. Lewis had claimant in Research Hospital from February 18 to March 3, 1956, during which time there were no complaints and no indication or mention in the hospital records and x-rays of any injury to the low back. Dr. Lewis after an examination of "extremities and spine" noted, "Lower back negative." This entire hospitalization was in connection with the February 1, 1955 accident.

On February 14, 1958, claimant was in another automobile accident (rear end collision), suffering a neck injury for which Dr. Overesch treated him. The Workmen's Compensation claim resulting from the February 14, 1958 accident was settled January 6, 1959.

On October 10, 1958, claimant was driving an ambulance for Kansas City Ambulance Company and was involved in a collision. "My back hurt and I had hot spots around my ankle." He was hospitalized in St. Margaret's Hospital in Kansas City, Kansas, from October 10, to October 16, 1958, for this, his second back injury. In connection with that accident he had a Workmen's Compensation claim in Kansas which was settled on March 2, 1959, on a rating of 25% permanent partial disability for $1,290.00. He also had a third party action against the driver of the other vehicle and in connection therewith was examined by Dr. Philip C. Nohe, an orthopedic surgeon, on March 1, 1960. Some pertinent extracts from Dr. Nohe's report, dated March 1, 1960, are: "Chief complaint: Injured lower back. * * * He believes he twisted his lower back at the time of impact, and had immediate pain in his lower back. * * He was hospitalized for two weeks under Dr. Nothnagel's care, received therapy treatments to his lower back and was on bedboards. He was much improved upon discharge from the hospital, and wearing a low back support. Since injury he has continued to have complaints about his back. With sitting or lying down he is fairly comfortable, but he has pain with getting in and out of a chair or in and out of bed. With strenuous physical activity he has pain radiation into both lower extremities, accompanied by numbness and tingling about the ankles, more marked on the left. He notes some stiffness about his lower back. He was off work approximately one and one-half months following injury. Since that time, due to continued complaints about his back he has had about "twenty different jobs". He has continued his care under Dr. Nothnagel and still wears his back support. He has increased aching and pain about his lower back with standing for a long period of time. His aching and pain are increased with any physical activity such as lifting, bending, stooping, and certain twisting motions. He has increased pain with coughing and sneezing, in his lower back. Although his pain and aching are relieved by rest, he still has complaints at night, and states that he is usually awakened two to three times during the night because of pain. He usually takes an "Emperin # 4" before going to bed. He has been taking muscle relaxant tablets recently, but no other active treatment. He has used heat, but obtains only temporary relief. The leg pain and peculiar sensation in his legs will come on with long standing, bending, lifting, and twisting. *Past History:* "He has had no other serious illnesses, injuries or operations. He states he had a 'whiplash injury' to his neck in 1955, from which he recovered satisfactorily. He denies previous injury to or difficulty with his lower back. * * * The patient at the time seen is wearing a short chair back type brace. * * * Flexion, extension, lateral bending, and rotation-extension are accomplished within normal limits and with no loss of motion, but with complaints of pain referred to the lower back on flexion, extension, and left lateral bending. He complains of pain when the area overlying the lumbo-sacral and right sacroiliac areas are palpated or percussed. Straight leg raising with the patient in a sitting position causes low back pain at 90 degrees. * * * With the patient prone he complains of tenderness when the area over the interspinous ligament of L 4-5, and L 5-T 1 is palpated. He also complains of tenderness when the ligaments over both sacroiliac joints are palpated. There are no muscle spasms about the patient's back. The sciatic and trochanteric areas are negative to examination."

Claimant testified that by May of 1960 he had recovered and had gone to work on the construction of a missile base at Cort-

land, Nebraska. He worked seven days a week averaging some 60 hours a week for more than seven months up to the first part of January, 1961. During 1961 he worked on numerous jobs such as running a rough riding Northwest shovel handling rock with a lot of vibration and jarring; loading a crane for shipment which involved a lot of bending, getting in under and twisting, pulling, prying and lifting in taking the tracks off and the boom out, and handling heavy cribbing; operating a DW 10 scraper with a lot of bouncing and rough riding; and operating a rough bouncing 160 scraper.

In December, 1961, he started working for his present employer operating a crane. When they were getting ready to load the crane for shipment to Knobnoster, it threw a track. Claimant had to get down and roll and pull and jerk to get it back on. The first day at Knobnoster it threw a track and he had to go through the same thing again. He testified he had no trouble with his back in doing any of this kind of work until after the accident of February 22, 1962.

We refer to claimant's medical and hospital records after February 22, 1962. A radiographic report dated November 26, 1962, made by Dr. Bevacqua at Dr. Osborne's request stated: "Include lumbosacral joint film. Lo back pain—left leg radiation. Film No. 42872—Date of report: 7-9-62 Radiographic report: 7/6/62 Lumbar spine shows a normal lordotic cure. The vertebral bodies, intervertebral spaces, interarticular joints and sacroiliac joints are within normal limits. Negative lumbar spine."

A Veterans Hospital report by Dr. Webb, dated July 16, 1962, stated: "PI: This 35 year old patient was admitted to the hospital 7/5/62. Patient was admitted with chief complaint of low back pain. Patient apparently has had intermittent difficulty with low back pain since 1946. Since that time patient has had intermittent episodes of low back pain with some history of left leg pain. The present episode began about two days prior to admission. PE: Examination of the back: General: Patient entered the examining room in a wheelchair. He can, however walk with a somewhat careful gait. There is no list present. There is no scoliosis present. He stands with a flat back and prominent obese abdomen. There is considerable paravertebral muscle tightness present in lower thoracic and lumbar areas. There are no areas of acute tenderness noted. He lies down and returns to the sitting position with apparent difficulty. Motions: Motion in forward flexion is quite limited, in that he can only move a few degrees in forward flexion. Fingertips come with 25″ of floor. Lateral bending is not particularly limited. Extension is moderately limited. Tests & Signs: Straight-leg raising: 40 degrees bilateral with marked hamstring tightness. Lasegue's sign: Negative. Tests & Signs: Gaenslen's sign: Negative. Reflexes: Present and equal. Sensation: No definite changes in sensation noted. Measurements: The leg lengths are equal. There is no atrophy present. DX: Low back strain. RK: P. T. Moist heat packs lumbar area and hamstrings 30 minutes twice daily."

■ Claimant's attorney objected to the admission in evidence of that portion of the above exhibit designated "PI" as "obviously" not being the statement of claimant to the hospital but is the consulting doctor's own review and interpretation of other hospital records in evidence. There was no objection made as to any lack of proper foundation being laid for the admission of the exhibit. While the exhibit may have been subject to other objections if they had been made, there is nothing on the face of the exhibit to show that these statements were not a summary of part of the history of his back claimant gave to the hospital attendants.

On November 14, 1962, Dr. R. C. Lewis examined claimant. Claimant gave Dr. Lewis an accident history consistent with

his present testimony. The report concluded: "The patient's signs and symptoms are consistent with a lumbar disc protrusion. At this time we feel his permanent partial disability is in the neighborhood of twenty-five per cent. We would anticipate that there is at least a fifty per cent chance of this patient requiring surgery at some future date." The Radiological Report read: "A lateral negative made to show the lower two thirds of the thoracic spine and films of the lumbar spine in the anterior posterior and lateral projections reveal a normal alignment of these portions of the vertebral column. The intervertebral spaces in the upper lumbar area are well maintained. The disc between the fourth and fifth lumbar vertebrae is very definitely narrowed and also between the fifth lumbar vertebra and the upper sacral segment. There are rudimentary ribs on the 12th dorsal vertebra. The last lumbar vertebra has a bifid type of transverse process that is sacralized on the left side with a free type of transverse process on the right."

Dr. Feierabend testified he examined claimant on March 8, 1962. Claimant had a congenital defect in his back earlier described. He found a thin disc at the L-five S-one level and a rudimentary disc between S-one and S-two. This rudimentary disc is congenital. His conclusion was that "This man has an architectural instability in the lumbo-sacral mechanism. * * * Recurring episodes of low back pain is suggestive of an intervertebral disc, a protruded disc. He has classical, clinical findings of a protruded intervertebral disc, including a depressed ankle jerk." He was asked a hypothetical question based on claimant's version of the evidence and stated in answer thereto: "I think this man obviously has had trouble with his back all of his life by virtue of the congenital defect and he had an episode of backache before, but apparently, based on the hypothetical question, he did a good deal of rather vigorous work at the missile base and has not been able to do that according

to the hypothetical question since the accident of February 22, 1962. *Nobody can say with any degree of accuracy,* but based on the hypothesis I think it is reasonable to assume that the major cause of his difficulty occurred as a result of the incident of February 22, 1962." (Emphasis ours.) He also gave his view based on a hypothetical question that claimant needed an operation on his back.

On cross-examination Dr. Feierabend stated Dr. Nohe's report indicated that on March 1, 1960, claimant had a lumbosacral sprain with symptoms "some of them are consistent with a herniated disc, however, there is not enough to diagnose it as a herniated disc."

At the outset we are confronted with the question of whether on the record before it the Industrial Commission could find that claimant failed to prove that while on the job on February 22, 1962, he did not slip and fall as he testified. Claimant suggests respondents are endeavoring to justify the award on the basis that the commission may decide a claim solely upon a finding of lack of credibility of uncontradicted and unimpeached testimony offered in support of the claim. However, respondents in their brief have simply joined issue with claimant on the question of whether there is competent and substantial evidence on the whole record to support the award.

We do not have before us a case in which the Industrial Commission denied relief solely on the basis of lack of credibility of claimant's testimony that he slipped and fell. Nor do we undertake to set out what the rule is in such a situation. The award before us states it is a "finding from all the credible evidence." It is not merely a ruling that claimant did not make out a prima facie case. It is a finding of fact and award based upon a consideration of all the evidence and not a finding based *solely* upon a lack of belief of claimant and his witnesses. See, Scott v. Wheelock Bros., (En Banc), 357 Mo. 480, 209 S.W.2d 149.

█ Claimant contends the Report of Injury filed by his employer describing his slip and fall resulting in injury to his back are admissions against interest and corroborate his claim, citing Tralle v. Chevrolet Motor Co., 230 Mo.App. 535, 92 S.W.2d 966. In that case the rule was stated that the Report of Accident when filed (as required by statute, Section 287.380, RSMo, 1959, V.A.M.S.) becomes a record in the case, which record is analogous to a pleading and is admissible and binding in the same way as a pleading as to admissions therein against interest, and is admissible in evidence in the same manner as a pleading. This rule has been even more succinctly stated in 2 Larson, Workmen's Compensation Law, Section 79.41, page 297: "The employer's report of the accident, which in most states he is required to file with the commission, is competent as an admission against interest. This is so even if the report itself is based upon hearsay, for by incorporating it in his report, the employer transfers it into an admission. * * Since the employer and insurer are identified in interest, the admissions of one are binding on the other."

█ The report of injury was first prepared by Kay Adams, as earlier described. Before it was filed by the employer its agent, J. R. Hachey, an employee of Travelers, who was in charge of this claim and who prepared and filed employer's "Answer" inserted the word "alleges" in items 7 and 23, which are the items concerning claimant's slip, fall and injury. Thus, the Industrial Commission had before it a report of injury based on claimant's statement of what occurred, which statement the employer and insurer did not adopt in its filed "pleading" until after it first noted that the report of what occurred was but an allegation. The resultant probative value, if any, as an admission against interest was for the determination of the Industrial Commission, to be considered along with the other evidence.

As earlier indicated, our duty is to review the whole record, including the legitimate inferences to be drawn therefrom, in the light most favorable to the award of the commission, and then determine whether the commission's findings are supported by competent and substantial evidence, and if so, determine if they are contrary to the overwhelming weight of the evidence. Damore v. Encyclopedia Americana, Mo.Sup., 290 S.W.2d 105. We must remain mindful that the claimant carries the burden of proof.

Although a claimant may testify he had an accident on the job and no one testified directly that he did not have one, it is usually true that there is other evidence, albeit circumstantial, and reasonable and permissible inferences therefrom, that also have probative value, and are pertinent to the issue. Sometimes this other evidence or reasonable inferences therefrom are contrary to claimant's testimony concerning one or more essential facts he must establish to receive compensation benefits. In such a situation it is the Industrial Commission's function to weigh all the evidence, and it may refuse to follow or believe claimant's testimony in view of the other evidence, or reasonable inferences from the other evidence, touching the issue. Illustrative is the en banc decision of Scott v. Wheelock Bros., supra, in which after a careful review of the former decisions on the subject, the court noted that while claimant testified she was a dependent of deceased and no one else testified she was not, there was circumstantial evidence from which a contrary reasonable inference could be drawn. The Industrial Commission found claimant was not a dependent and its final award denying compensation was affirmed.

Similarly, in the most recent supreme court decision on the subject, Snowbarger v. M. F. A. Central Co-operative, 349 S.W. 2d 224, Judge Hollingsworth speaking for the court en banc stated that the commission cannot be required to accept as true the testimony of claimant's witness if the

commission, in exercising its powers and duty to determine the facts, does not believe the testimony of that witness. In affirming the commission's award of no compensation the opinion stressed reasonable inferences from the evidence, which inferences were supportive of the award, and held there was competent and substantial evidence on the whole record to support the award. To the same effect is the recent case of Ginter v. Freund Baking Company, Mo.App., 388 S.W.2d 505.

Viewing the evidence in the light most favorable to the award of the commission what evidence, or reasonable inferences from evidence, are there which are supportive of the finding that claimant did not slip and fall as he testified?

■ According to claimant's own testimony there were seven to ten employees nearby when he allegedly fell yet none of them saw him fall. One employee was looking toward him and laughing yet when later contacted he remembered no incident of such a fall. Nor did claimant tell any of these employees that he had fallen although he presumably worked nearby them the rest of the day. Claimant did not tell his job superintendent he had fallen although the superintendent came around later that morning. Nor did claimant report the fall to anyone else. When he rode some 45 miles home that evening spending one hour in the pickup truck with his job superintendent and two other employees he did not mention his fall or his "stiffness" to any of them. The next morning (Friday) although claimant testified he couldn't get out of bed without help and had to be rolled out of bed and helped off the stool, and was experiencing real pain, when his job superintendent telephoned him to tell him not to report to work the following Monday because of inclement weather, he did not tell his job superintendent he had a fall or was in any way incapacitated or in pain. He made no mention of the incident at all. Although, according to him, he was confined to bed

Friday, Saturday, Sunday and Monday, he did not notify his company or call a doctor. It was not until some time after he called his lawyer, probably on Monday, that he tried several times to contact his company. When, that contact (with Buck) was not satisfactory, he did not report his accident to the company until March 5th, some eleven days after his accident. This evidence is sufficiently inconsistent with what one would normally do under such circumstances that we cannot rule as a matter of law the Industrial Commission could not draw from it an inference that he did not on February 22, at or about the time stated have the slip and fall he now claims. This is especially so in view of his previous experience with Workmen's Compensation claims. Claimant makes no contention he didn't know the value of timely reporting accidents to his employer. The Industrial Commission did not have to accept his explanations for his conduct that was inconsistent with his claimed slip and fall.

■ In addition to the above evidence the Industrial Commission also had before it evidence that claimant had been inconsistent in statements he had made to others concerning how, when and where his back first became injured in 1945, the extent of such injury, and his purported recovery, from that and other back injuries previous to his present alleged back injury. These inconsistent statements concerning the history of the health of his back reflect upon his general credibility and accuracy in reporting events, and the commission is entitled to consider these inconsistencies in its evaluation of claimant's testimony. While claimant now contends these inconsistencies are not "any impeachment" of his testimony of his fall and resultant injury because they are not an intentional false swearing to a material fact, we note his counsel advised the referee at the outset of the hearing that claimant's credibility was an issue, and we believe the commission could consider earlier inconsistent statements concerning his various back in-

juries along with the other evidence in evaluating his testimony.

In view of our ruling that there was competent and substantial evidence to support the Industrial Commission's finding in effect that there was no slip and fall as alleged, there is no need to review the lengthy and conflicting medical testimony concerning the issue of whether he had a herniated intervertebral disc produced by a fall on February 22, 1962. We note in passing there was evidence that prior to February 22, 1962, he had twice severely injured his back and had resulting symptoms and disability at least somewhat comparable (see Dr. Nohe's report of March 1, 1960) to those existing after February 22, 1962, as evidenced in the Veterans Hospital records.

Claimant's contention the commission erred in refusing his request for two additional findings of fact was denied on the ground it was not submitted prior to the entry of the Final Award. This is not a proper ground for the denial of such a request. See, Fisher v. City of Independence (Mo.Sup. En Banc), 370 S.W. 2d 310, 316(4); Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, 660. If the findings of fact do not sufficiently reveal the basis of the decision and how the controlling issues have been decided sufficient additional findings of fact should be made even if requested after the entry of the award. However, in the instant case while the findings of fact could have been more detailed, we have been able with some difficulty to ascertain the basis of the decision and how the controlling issues were decided. We therefore hold there was no prejudicial error involved. See, Groce v. Pyle, Mo.App., 315 S.W.2d 482; Michler v. Krey Packing Company, En Banc, 363 Mo. 707, 253 S.W.2d 136.

With reference to claimant's contention he should be reimbursed for the $40.00 expense of seeing "his" doctor at the direction of Kay Adams, who told him the company would pay that bill, we agree

he is entitled to that reimbursement. Cf. Myers v. Cap Sheaf Bread Co., 354 Mo. 943, 192 S.W.2d 503.

We have carefully considered all the evidence in order to determine whether the final award of the Industrial Commission is clearly contrary to the overwhelming weight of the evidence, and have concluded that it is not, except as to the mentioned $40.00 medical bill. The Final Award should be amended to grant claimant reimbursement of the $40.00 paid by him for medical services which respondents had authorized. In all other respects the Final Award of the Industrial Commission is without error and according to law.

To permit the above described amendment of the Final Award, the judgment of the circuit court is reversed and the cause is remanded to the circuit court with directions to remand to the Industrial Commission for further proceedings in accordance with this opinion.

All concur.