232 P.2d 975

ROBERTS v. DREDGE FUND et al.

No. 7753.

Supreme Court of Idaho.

June 20, 1951.

Robert E. Smylie, Atty. Gen., Glenn A. Coughlan, Asst. Atty. Gen., for appellants.

Whitla & Knudson, Coeur d'Alene, for respondent.

382

GIVENS, Chief Justice.

Nick G. Roberts was employed as a pipeline tender on an electrically driven dredge operated by a Mr. Hersehgen, clearing out the channel of a stream. Mr. Roberts' shift was from three o'clock in the afternoon until eleven at night. About seven-thirty p. m. on July 23, 1949, a transformer fuse burned out in a substation about one thousand feet from the dredge, through which the dredge received its electrical power (13,000 volt line).

Mr. Torkelson, who was foreman of the dredge, when the lights went off, went towards the transformer house and met Mr. Hersehgen and Mr. Roberts. Torkelson left the house to secure the attendance and services of Mr. Atkinson and Mr. Doolittle, evidently employees of the Washington Water & Power Company, supplying the power, and alone entitled to service the transformer, etc. Upon their return, Mr. Roberts stood outside a metal fence surrounding the transformer house with Mr. Torkelson's two daughters, aged six and seven years. As Mr. Atkinson started to replace a fuse, a short occurred attended by a roar and a big ball of fire four feet in diameter, which burned a metal bracket. The little girls screamed, which turned the attention of the other men to them and Mr. Roberts, who was lying upon the ground outside the steel fence, apparently not in contact with it. Upon their going to him, he appeared to be dead. Artificial respiration was given him without success. Dr. Gibbon was called immediately and estimated the time of death to be from fifteen minutes to an hour before he reached Mr. Roberts, who was still lying near the fence. Dr. Gibbon observed no electrical burns on or about his person and in answer to a hypothetical question, synopsizing the above circumstances and seeking the cause of death, answered:

"A. A shock, I don't mean an electric shock, I mean a shock to his system by a sudden flash, you might say by a blow to his mind to see this sudden ball of fire. I felt, and I feel now that the cause of his death was hastened by the fact that this shock from the ball of fire which has caused his heart to stop beating from, probably,—my assumption was and is now, from occlusion of a coronary artery which happens very frequently in people of his age, and caused his death."

"Q. Doctor, will you explain the basis upon which you say that this man had a coronary occlusion,—what leads you to believe that? A. From the fact that it is a definite cause of death in this age group and from finding no evidence of burn on the bare parts of the body that I examined, and knowing that sudden exertion or sudden excitement, shock, as was referred to there, can cause the heart to beat rapidly and perisystole these things."

He gave his further opinion that Mr. Roberts did not suffer a cerebral vascular accident—in common parlance, a stroke; that without an autopsy it was not possible

to state definitely what the exact cause of death was. (No autopsy was performed because someone, not indicated, objected to it.)

Dr. Whitesel did not see Mr. Roberts after his death, but in answer to a like hypothetical question, stated:

"A. Well, I think that an exciting factor like this occurrence could precipitate a massive vascular collapse that would be an etiological cause of a coronary thrombus.

    *    *    *    *    *    *

"A. Well, I think considering all of the facts we have concerning the occurrence as it happened that evening, and having known about his previous health status, in all likelihood the cause of death is pretty definite."

He stated further than only an autopsy would show positively the cause of death and that he did not think there was a chance the deceased had died from a cerebral hemorrhage or stroke.

Dr. Mowery, who examined the body, merely testified he did not think death was occasioned by any connection with an electric current, but was not asked and did not testify as to any other cause. No one contended that deceased had come in contact with an electrical current; consequently, the testimony was without pertinency as to the issue involved.

The Board's findings approximate the above résumé of the detailed facts and circumstances and ruled as a matter of law that the deceased's death was occasioned by an accidental injury arising out of and in the course of his employment.

Appellants urge the evidence is insufficient to show there was an accidental injury because there was no injury which resulted in violence to the physical structure of the body as required by Section 72–201, I.C., and the accidental injury, if there were one, did not arise in the course of deceased's employment.

Mr. Roberts had been asked by Mr. Torkelson to look after his, Torkelson's, daughters while he went to call the employees of the Washington Water & Power Company; Mr. Roberts was on shift at the time of his death; the dredge needed the electrical current to operate it and it was the duty of the men operating the dredge, including Mr. Roberts, to ascertain what trouble interfered with the transmission of power and that is what Roberts and Hersehgen were doing when Mr. Torkelson first saw them. It is thus obvious Mr. Roberts had to wait until the power was again turned on to the dredge before he could resume his work. The distance between the transformer and the dredge, while a factor to be taken into consideration, does not control as to whether or not the deceased's presence there had taken him out of the course of his employment. The facts and circumstances herein show he was clearly within the course of his employment within the law as exemplified in Re MacKenzie, 55 Idaho 663 at page 669, 46 P.2d 73, 75: " 'It is essential to the right to

compensation that the injury shall have been received in the course of the workman's employment; that it shall have been received while he was doing some act reasonably incidental to his work. An accident or injury is so received where it occurs while he is doing what a man in like employment may reasonably do within a time during which he is so employed, and at a place where he may reasonably be during that time. "Course of employment" includes acts in which the employer has acquiesced, though they are not done in a strict performance of the employee's duties. An employee is not, like a part of a machine operated by him, fixed to precisely the mechanical movements he must perform in order to discharge his industrial function. He may do whatever a human being may reasonably do while in the performance of his duty without such acts placing him outside of the course of his employment.' "

"They also serve who only stand and wait."—Milton.

Neale v. Weaver, 60 Idaho 41, 88 P.2d 522, strongly relied upon by appellants on this point, considered totally different circumstances; the employee at that time was engaged purely in his personal affairs and with nothing in any way connected with his employer's business; while the deceased herein, though not actively engaged in assisting in making the repairs on the electrical apparatus, was on shift and was present by reason of and in connection with his employment.

"The location of the motors, with reference to the place where the employee performed her work, was one of the conditions attending her employment, (cases); and the report and flash which they emitted when they were blown out by the bolt of lightning, frightening the employees in their vicinity, was a risk of employment in such a place, and a paralyzing injury produced by the fright could be found to be causally connected with the employment." Charon's Case, 321 Mass. 694, 75 N.E.2d 511, at pages 513–514.

There can be no question that the short caused in attempting to put in a new fuse and the attendant loud noise and explosion and ball of fire constituted an accident. Two doctors testified there was a causal connection between this electrical disturbance, not contact with the electric current, and deceased's death. We believe we are justified in stating the doctors meant, in slightly different and perhaps more colloquial language, that the occurrence, i. e., the electrical explosion, light and noise, caused immediate collapse, i. e., a shrinking together of the blood vessels of deceased, both arterial and venous, resulting in a stoppage of the flow of blood into and through his heart; the heart stopped beating and there is no question of doubt that Roberts died immediately. In other words the doctors who were interrogated and the Board found that Mr. Roberts was killed because of shock to his nervous system, which in turn affected his heart and it was sufficiently violent to the physical

structure of his body to cause death. The authorities considering this precise point are uniform in holding there need not be physical contact between the accident and the person to constitute an accidental injury. Carr v. Martin, 35 Wash.2d 753, 215 P.2d 411.

In Burlington Mills Corp. v. Hagood, 177 Va. 204, 13 S.E.2d 291, the employee was working at a machine approximately 15 feet away from an electrical motor which was being repaired. A loose wire in the motor caused a short circuit, which produced an electric flash and a sound resembling that of a shotgun. The employee saw the flash and started to fall backwards, but was caught and supported by another employee. First aid was administered. The employee, after the accident, when she saw the person who had helped her, again fainted. There was no pathology disclosing electrical burns or other physical conditions which usually follow electrical shock. The doctors stated she had traumatic neurosis resulting from the shock and that in turn the irritation of the nerves caused functional disorders, and whether the disability resulted from nervous reaction or from auto-suggestion set in motion by memory of the accident, the result was the same. The Commission awarded compensation and the court sustained it, holding the disability was occasioned by an injury which may be traced to a risk which arose out of and in the course of her employment and there was a direct causal relation between the electric flash and the irritated condition of her nervous system.

In the instant case the shock was sufficiently great to cause death, which thus was more violent to the physical structure of deceased's body than in the last cited case, but clearly supported thereby; as in Charon's Case, supra, thus related and decided: "A severe storm occurred while the employee was eating her lunch at the machine at which she worked on the first floor of a four-story mill building. Lightning struck the roof and followed the sprinkler system to the first floor where it burned out or blew out three motors, causing a loud noise and a considerable flash of light, frightening the employees, and producing such a shock to the claimant that she sustained a hemiplegia or paralysis of her left side. The reviewing board found that the hemiplegia was directly traceable to the fright caused by the blowing out of the motors, accompanied by the noise and flash of light which were induced by the bolt of lightning, and that the harm sustained by her constituted a personal injury which arose out of and in the course of her employment. The board awarded her compensation."

The court sustained the award, holding: "This statute does not in terms or by implication exclude an injury causally connected with the employment merely because the injury was not occasioned by physical impact or the application of some form of external violence to the body.

The quoted words have been construed as not limited to such injuries as are caused by contact with some physical object, (cases); * * * ."

To like effect and in principle are: American Smelting & R. Co. v. Industrial Commission, 59 Ariz. 87, 123 P.2d 163; Peavy v. Mansfield Hardwood Lumber Co., La. App., 40 So.2d 505; Hall v. Doremus, 114 N.J.L. 47, 175 A. 369; Geltman v. Reliable Linen Supply Co., 13 A.2d 844, 18 N.J. Misc. 423.

In Van Ness v. Borough of Haledon, 45 A.2d 673, 675, 24 N.J.Misc. 29, the employee, a police marshal of a municipality, under great strain and excitement from driving a car to secure an ambulance, suffered a fatal heart attack and died, diagnosed as a coronary occlusion induced by extreme emotional strain and excitement. It was urged there was no legal proof of injury by accident in that there was no distinct episode or incident which can be pointed to as an accident and in the absence of an autopsy, the medical conclusion, therefore, of the fatal coronary occlusion must need be purely speculative. The court said:

"The respondent's other contention is that there is no proof of an injury by accident and no proof of causal relation. We cannot agree. The death certificate and three medical experts gave as the cause of death coronary occlusion. All the experts agreed that excitement, confusion, restlessness, anxiety, emotional strain, could produce coronary occlusion. The testimony clearly establishes the excited, confused, emotional state of Van Ness. There is no other medical conclusion offered as to the cause of death. The medical expert for the respondent said that without an autopsy any cause of death was speculation. That may be true, but we have no autopsy here to aid us. We must deal with the facts as we have them. That the decedent was excited we know from witnesses who saw * * * the manner in which he drove his car. That coronary occlusion is a logical medical hypothesis is evident."

"There is, of course, a presumption of death from natural causes; but the evidence is entirely convincing that the immediate cause of the officer's death was a coronary occlusion induced by emotional and nervous strain attending the performance of his duty, and thus his demise was the result of an accident which arose out of and in the course of his employment." 136 N.J.L. 623, 56 A.2d 888, 891.

It might appear that Bekeleski v. O. F. Neal Co., 141 Neb. 657, 4 N.W.2d 741, 742, is opposed to our conclusion herein and particularly because it interprets a statute identical with ours as signifying the terms "injury" and "personal injuries" mean only violence to the physical structure of the body. The circumstances therein were: "* * *, while plaintiff was operating the elevator, a passenger riding

therein was caught between the floor of the elevator and the second floor of the building and killed. The record shows that plaintiff was lodged in the elevator with the dying man for some thirty minutes before the doors were broken in and his body removed. Plaintiff claims that the sight of this terrible accident and her proximity to it when it occurred resulted in an injury to her nervous system which constitutes permanent total disability, entitling her to benefits under the workmen's compensation law."

There is a marked difference between that case and this, because herein the employee died. With all due respect to the majority, we think the dissent is more scientifically reasoned and more worthy of acceptance: " * * * It (plaintiff's claim) is rejected on the sole ground that she did not prove 'violence to the physical structure of the body.' * * * I am inclined to think that the lawmakers, by the use of the term 'violence to the physical structure of the body,' meant an animate body with a directing brain containing blood, sensitive nerves, fibers and convolutions. The brain is part of the physical structure of the body. Without it there could be no performance of an employee's duties. Accidental violence to the brain and resulting disability may be difficult to prove, but plaintiff was rational before the accident and irrational afterward. Her blood pressure was higher and her pulse more rapid. The pupils of her eyes were dilated and her posture abnormal. She had tremors and was unable to walk in her usual manner, all as properly indicated by the majority opinion, but it seems to me these results of the accident evidence 'violence to the physical structure of the body,' within the meaning of the compensation law." 4 N.W.2d at page 744.

If we substitute "heart" for "brain," we have the present situation arriving at the legitimate conclusion that the violence to the physical structure of deceased's body was stopping the heart as a living organism.

The following exposition of the law further clearly substantiates this view: "If the driver's efforts to avoid the accident had brought the truck to so quick a stop that he had been thrown so hard against the steering wheel that he had broken a rib, or had jabbed his leg against a brake and had thereby blood poison, or had strained so greatly in turning the truck from its course, he had sustained a sprained back, hernia, a rupture of an aneurism, a dilated heart, or had burst a blood vessel of the eye, an accidental injury would have resulted in every illustrative instance here given quite independently of the injury being traumatic or not, or whether direct or consequential, or whether or not his anterior physical condition was such as would have predisposed him to any of the particular injuries thus prematurely sustained. Supra. Hence, if the cause be accidental, the personal, injurious, and proximate effect in causative

relation is an accidental injury within the meaning of the statute no matter; for example, if the burst vein or artery be in the brain, lung, heart, eye, or hand. It is not perceived that there is any fundamental difference in law or in principle between an injury causatively resulting from a blood vessel being cut or crushed and one broken by an artificial distension of that blood vessel from fright, apprehension, or exertion directly and proximately a consequence of an accidental event." J. Norman Geipe, Inc., v. Collett, 172 Md. 165, 190 A. 836 at pages 839–40, 109 A.L.R. 887.

Despite the opinion of an intermediate appellate court in Pennsylvania, Liscio v. S. Makransky & Sons, 147 Pa.Super. 483, 24 A.2d 136, the pronouncements of the Supreme Court of that State, we believe, are in line with the conclusion herein: Lane v. Horn & Hardart Baking Co., 261 Pa. 329, 104 A. 615, 13 A.L.R. 963; Clark v. Lehigh Valley Coal Co., 264 Pa. 529, 107 A. 858, and it will be noted that the Maryland case, J. Norman Geipe, Inc., v. Collett, supra, relied upon, among other authorities, Clark v. Lehigh Valley Coal Co., supra.

The award of the Board is affirmed. Costs awarded to respondent.

PORTER, TAYLOR, THOMAS, and KEETON, JJ., concur.