Joseph P. SPECIE, Claimant, Respondent,

v.

HOWERTON ELECTRIC COMPANY, Employer, Appellant,

and

Massachusetts Bonding and Insurance Company, Insurer, Appellant.

No. 23298.

Kansas City Court of Appeals.

Missouri.

March 6, 1961.

Howard F. Major and Frank Conley, Columbia, for appellant.

Roswell P. Henderson, Moberly, for respondent.

ELMO B. HUNTER, Presiding Judge.

This is an appeal from the judgment of the Circuit Court of Randolph County, Missouri, affirming an $8,379.10 award of the Industrial Commission in favor of claimant-respondent, Joseph P. Specie, against appellants, Howerton Electric Company, as employer, and Massachusetts Bonding and Insurance Company, the insurer.

The disputed question is whether or not claimant is an independent contractor. The parties agree that if he is an independent contractor he is not an employee within the meaning and provisions of the Workmen's Compensation Act so as to entitle him to the compensation and benefits for the injuries sustained by him. See, Rucker v. Blanke Baer Extract & Preserving Co., Mo. App., 162 S.W.2d 345; Sargent v. Clements, 337 Mo. 1127, 88 S.W.2d 174; Hackler v. Swisher Mower & Machine Company, Mo. App., 284 S.W.2d 55. If he is not an independent contractor, appellants tacitly concede the judgment for claimant should be affirmed.

The referee and the Industrial Commission of Missouri, found claimant to be an employee within the coverage of the Workmen's Compensation Act and not to be an independent contractor, and the Circuit Court on review of the record affirmed that finding.

█ The word "employee" is defined in the Workmen's Compensation Law, Section 287.020 RSMo 1949, V.A.M.S., as "every person in the service of any employer * * * under any contract of hire, express or implied, oral or written * * *" and the word employer has been defined in Section 287.030 as "every person * * * corporation * * * using the service of another for pay." In Baldwin v. Gianladis, Mo.App., 159 S.W.2d 706, 708, the court said: "These definitions as well as the whole of the Workmen's Compensation Law should be broadly and liberally construed by the courts in order to effectuate the legislative intent to afford compensation to an employee * * *." See, also, Dost v. Pevely Dairy Co., Mo.Sup., 273 S.W.2d 242–44.

█ Our state constitution requires the findings of the Industrial Commission to be supported by "competent and substantial evidence upon the whole record." V.A.M.S.

Const., Article V, Sec. 22. On review of questions of fact decided by the Industrial Commission, our inquiry, as that of the circuit court, is limited to whether the findings of the commission are supported by competent and substantial evidence upon the whole record. As stated by our Supreme Court, en Banc, in Kansas City v. Rooney, 363 Mo. 902, 254 S.W.2d 626, 628: "This 'does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence.' "

■ Additionally, decisions of the commission which are clearly the interpretation of or application of the law, as distinguished from a determination of the facts, are not binding on the reviewing court and fall within the court's province for review and correction. Williams v. Great Atlantic & Pacific Tea Co., Mo.App., 332 S.W.2d 296(2); Vaseleou v. St. Louis Realty & Securities Co., 344 Mo. 1121, 130 S.W.2d 538.

We proceed to set out from the record evidence pertinent to the question presented.

Prior to September, 1957, the appellant, J. H. Howerton, doing business as Howerton Electric Company, was awarded the subcontract for the electrical work on the South Park School at Moberly, Missouri, by Scheperle Construction Company, the general contractor. After receiving this contract, Howerton was the successful bidder for the electrical work on a job in Springfield, Missouri, and Mr. Howerton contacted respondent Joseph P. Specie, doing business as Specie Electric Shop, Moberly, Missouri. Specie had been an electrician by trade since 1928, had his own place of business in Moberly and employed some six men with whom he worked. As testified by Mr. Howerton:

"I called him * * * asking him if he would consider handling part of the work until such time as we could move on the job with our own crew." * * * "I knew he was familiar with the job, and asked him by phone if he would be interested in furnishing men for as long as we required his services—ultimately that is the basis of our agreement * * * we came to an agreement that he was to charge xxx-dollars for a foreman and xxx-dollars for helpers, * * * he was to include his insurance and any markup that he thought that he ought to have for running the job. * * *

"Q. * * * you asked him if he would consider handling part of the job—I assume that you meant labor part—'until I (Howerton) could move in with my own crew?' A. That is correct.

"Q. How long did you contemplate that would take? A. Well, it was an intangible item because of the weather. * * * *" * * *

"Q. Could you have moved in sooner under the terms of your agreement with Mr. Specie? A. Yes, I could have if I had wanted to.

"Q. Could you have moved in at any time you wanted to? A. According to our agreement, yes—that was the understanding, that I could move in any time I wanted to.

"Q. Now, when you say you could move in at any time you wanted to—do you mean that you would then, with your employees, take over the work that was then being performed by Mr. Specie and various other men? A. Well, that's what we did do. We did do that in March, we actually moved in en masse, and his men left the job. * * *

"Q. Then the agreement with Mr. Specie covered no particular length of time, it was merely a continuing agreement from week to week? A. That is correct."

Howerton also agreed to and did place on the premises a van which served as an office and headquarters for Joseph Specie, and from which van all materials were supplied. These materials were provided and placed there by Howerton and kept up to date by him as the job progressed.

The plans and specifications for the project, prepared by the architect, were given to Mr. Specie by Mr. Howerton. Howerton stated that normally he would prepare in addition to the plans and specifications such things as notations as to height, sizes, routing and so forth, but in this instance no changes were needed or made. Howerton went to the job site and made periodic inspection of the work in progress being done by Specie. Howerton's superintendent, Mr. Sullivan, also made some inspections.

Specie testified that when Howerton contacted him relative to the job, Howerton told him, "Well I want to be privileged to come in at any time and take over and put my men on and go ahead. I said that'll be all right. * * *"

Mr. Specie stated he and the men he used on the job "were to be paid each week by sending in our hourly wage time card." They were paid by the hour—journeymen $3.90 and helpers $2.05. "* * * he asked what I would do it for per hour * * * and we agreed on those pays * * *."

Thus, at the time the job was started, Specie was to receive $3.75 per hour for each journeyman electrician and a journeyman electrician's wages at that time were $3.10 per hour. Specie turned in the total number of hours worked by his employees, and received a check from Howerton on a weekly basis and would in turn issue his own checks to meet the payroll of the em-

ployees he provided, deducting their social security and withholding taxes.

Specie was a journeyman electrician and worked "right along on the job with the rest." He worked and was on the job at all times from February 24th until March 24th when he fell from an "I" beam while working and suffered the injuries involved in the present litigation. He was paid $3.90 per hour for all the time he worked.

On the subject of control and direction of the work Specie testified:

"Q. Did Mr. Howerton or one of his associates or employees direct your work? A. I wouldn't say they directed the work—each week they came by and checked up with us and looked over the job and talked to us a minute or two and then out and gone.

"Q. You indicate there was no need for direction? A. That's right.

"Q. In other words, had you been doing something wrong then he or his man who came each week would have directed you to correct it? A. Right. * * * At any time he had the privilege of coming and taking right over. * * * each time he said we were doing okay, everything was all right as far as he knew. * * * At all times we had to answer to Mr. Howerton or his superintendent for anything that would have come up and would have been wrong—we would have had to answer to him or to his superintendent."

The first day, September 7, 1957, Specie went to the trailer Howerton furnished and went over the specifications with Howerton's superintendent, Mr. Sullivan.

"Q. That is who you got your initial instructions from? A. That's right. * * *

"Q. Were you instructed by Howerton or his superintendent how to do the work? A. We were instructed how

to do the work the first day that we met.

"Q. When you got the plans? A. When we got the plans. * * *

"Q. But thereafter you got no instructions, is that right? A. Right.

"Q. But you say none were needed, apparently? A. Apparently."

Mr. Specie had been an electrical contractor over five years and felt he knew how to read blue prints and how to do this type of job. He had been one of those who had unsuccessfully endeavored to get the job. " * * * I was very familiar with the job—because I just had went through the job and figured the job up and I knew what had to be done—but I had to answer to Mr. Howerton—he might have had an altogether different way to have conducted the work. * * * I was responsible to Mr. Howerton or his superintendent at all times."

He recognized it was his duty to follow Mr. Howerton's orders as to how any of the work was to be done.

"Q. You stated a moment ago that you were responsible to Mr. Howerton —for what? A. For any ways that might have been wrong or any way that I'd done that didn't suit he—for the progress of the job. * * *

"Q. Did anyone on that job, other than you, have the right to tell any of these men where to work and how to work? A. Yes, Sir.

"Q. Who had that right? A. Mr. Howerton or his superintendent, any time could come in and tell those boys to go anywhere on the job and do anything to be done—or the superintendent could say—boys we're going to work over here, on this section, we want to get that out of the way—* * *

"Q. To whom? A. To either one of my boys or myself. * * * I had six men on the payroll—they weren't all there, but Mr. Howerton or his superintendent could control those boys at any time he came down or at any time.

"Q. I believe you said he made his appearance weekly? A. He did—but if they happened to come through and stop, they had a perfect right to say whatever they wanted to say to me or either of the boys. * * *

"Q. After you fell, then what happened, as far as this job was concerned? A. The boys carried on— the men carried on I think the balance of the week and then Mr. Howerton's crew taken over * * *."

Mr. Specie also had another job at a water filtering plant in Moberly. He testified that the arrangements there were the same as he had with Howerton. They had blue prints and specifications on that job also. There, "they had the same supervision that we had on the other job.

"Q. Well, what was the supervision they had out there then? A. Any time Mr. Ellis came in—or his superiors, they told us what—if they wanted any difference in the work they had the privilege of telling us to do.

"Q. They would tell you what to do, wouldn't they? A. That's right.

"Q. And then you would tell the men what was to be done? A. They told the men what to do even if I worked there. * * *

"A. Whoever we are working for— in the case of the two jobs, the South Park School with Mr. Howerton or the Ellis job out to the water works—if either one of those, Mr. Ellis or Mr. Howerton or the superiors came in and told us to put a pipe a mile out in the yard we would put it there regardless, because we are answering to them, even though it was wrong with the blue print, because they might have made arrangements to have that put there.

"Q. But you wouldn't expect that, would you? A. But I wouldn't expect it.

"Q. You'd normally follow the blue prints? A. We followed the blue prints, but if they would have told us to put it—no matter where they told us to run a line, regardless of the blue prints we would have put it there, because all we had was labor and we figured they knew—they was the ones that was going to have to answer for it.

"Q. That's true when you took a job under the arrangement that you had with Mr. Howerton? A. Yes, Sir. * * *

"Q. But when you were working for Howerton or Ellis you did not consult the architect? A. I didn't have to consult the architect, all I had to do was—Mr. Howerton or Mr. Ellis came out and suggested or told us to do anything and we would do it at their directions, their supervision.

"Q. You normally ended up though, completing the job so as to comply with the specifications? A. Yeah, yes.

"Q. But when you worked for another man you followed his instructions. A. Absolutely, he is prior to the blue prints or specifications."

Based upon this evidence, the Industrial Commission made these findings: "* * * that the employer reserved the right to control the claimant's performance of the details of the work. Further, that the employer reserved the right to discharge the claimant and his three helpers at any time, and to substitute the services of his own regular crew. The claimant was paid hourly wages of $3.90 an hour, plus a .50¢ an hour override of each of his helpers, rather than being paid an agreed lump sum. While the record is silent as to who furnished the tools, the employer furnished the materials for the job. There is no showing that the claimant had the right to substitute the services of others for his own. The employer had the right to discharge those who assisted the claimant in the performance of the work, and, in fact, exercised such right shortly after the accident."

The legal tests to be applied in determining whether one is or is not an independent contractor have been recently summarized in Nabors v. United Realty Company, Mo. App., 298 S.W.2d 474–477, "Whether in a given case a worker is an employee or an independent contractor depends upon the right of the employer to control his physical conduct in the performance of the details, i. e. the manner and method, of doing the work. In ascertaining the existence of the right to control the following factors are to be considered: the reservation in the contract of the right to control, or the actual exercise of control; the right in the employer to discharge the worker at any time without incurring liability for breach of contract; the payment of wages by the hour rather than by an agreed lump sum; the supplying by the employer of tools, machinery and appliances necessary to accomplish the work; the personal nature of the employment (whether the worker has the right to substitute the services of other persons), and whether the employer has the right to hire, discharge and determine the pay of those who assist the worker in the performance of the work. * * * Of these factors the right to control the details of the work is of 'extreme,' * * * and 'supreme' importance, * * * indeed ·is the 'primary test,' * * * and the one factor that is entitled to the greatest weight." (Citations omitted.)

Having in mind these legal tests we must from our examination of the evidence determine whether, giving claimant the benefit of all reasonable inferences supporting his position, the findings of the commission are supported by·competent and substantial evidence on the whole record and are not clearly contrary to the overwhelming weight of the evidence. The evidence and its reasonable inferences indicate that:

**320**

1. Both Howerton and Specie recognized the right of Howerton to exercise control over the manner and the method of the work and its details, and not merely to make suggestions. Howerton and his foreman did to some extent actually supervise this work even though very little supervision was required because of the competency of Specie. As stated by Specie, Howerton not only gave him instructions the first day "but I had to answer to Mr. Howerton —he might have had an altogether different way to have conducted the work." * * * "I was responsible to Mr. Howerton or his superintendent at all times."

2. Both Howerton and Specie recognized the right of Howerton to control the manner and method of the work of whatever other men Specie provided. "Q. Did anyone on that job, other than you, have the right to tell any of these men where to work and how to work? A. Yes, Sir. * * * Mr. Howerton or his superintendent any time could come in and tell those boys to go anywhere on the job and do anything to be done. * * * (Mr. Howerton) could control those boys at any time he came down or at any time."

3. Both Howerton and Specie recognized the right of Howerton to discharge Specie or any of his workers at any time. "Q. Could you have moved in (discharged Specie and his men) at any time you wanted to? A. According to our agreement, yes —."

4. The payment of wages was by the hour—i. e. by time rather than by the "job".

5. The materials and supplies were provided by Howerton.

█ Concededly, not all of the evidence points toward the employee relationship. However, in view of the great weight accorded the factor of right to control, for it is the right more than the exercise of it that is important; coupled with the other indicia of the employee relationship which we have set out we are unable to say that the findings of the Commission are not sup-

ported by competent and substantial evidence upon the whole record or that they are clearly contrary to the overwhelming weight of the evidence. Nor are we able to say that the commission misapplied or incorrectly applied the law to those findings of fact.

The judgment is affirmed.

All concur.