Gerald Wayne TODD, Appellant,

v.

Winifred GOOSTREE, d/b/a Goostree Hauling Company, and United States Fidelity & Guaranty Company, Respondents.

No. 25576.

Missouri Court of Appeals,
Kansas City District.

Jan. 19, 1973.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 6, 1973.

Application to Transfer Denied May 14, 1973.

Formby & Stewart, James S. Formby, and Robert E. Stewart, Kansas City, for appellant.

Gordon N. Myerson, Kansas City, for respondents.

Before SHANGLER, C. J., and CROSS and DIXON, JJ.

SHANGLER, Chief Judge.

In this workmen's compensation case, the claimant employee suffered great emotional shock when he discovered beneath the wheels of his truck the crushed and lifeless body of his friend and fellow worker. As a result of that gruesome experience, the claimant suffered a severe and chronic traumatic neurosis, conceded by the Industrial Commission to be a "very real" disability. The Industrial Commission by a divided decision, nonetheless, entered an award denying compensation on the ground

that the claimant's mental and emotionally induced disability was not a compensable "injury" within the meaning of Section 287.020(3), V.A.M.S. Upon review, the circuit court affirmed the award and the claimant appeals from that judgment. The question presented for decision is whether a neurotic disability which is caused by emotional shock is an "injury" within the statutory definition.

The facts in evidence are not in dispute, either as to the occurrence or its results. On September 14, 1966, the claimant was employed by respondent Goostree Hauling Company as the driver of a tandem dump truck and, in the course of his employment, was hauling rock from a quarry. Just prior to the tragic incident, claimant had driven the truck into the quarry and was waiting his turn to be loaded from a Hyloader, which was then occupied with a truck operated by a fellow employee named Swift, known familiarly to the claimant as "Reverend Swift". At a signal from the Hyloader operator, claimant backed his truck under the Hyloader and stopped. The Hyloader operator first started his machine, then turned the motor down, got off the machine, walked toward the claimant's truck and looked under it. The claimant assumed something was wrong with his truck, got down and walked around it, following the Hyloader man. When he reached the rear of the truck, the claimant was confronted with the sight of Swift's dead body under the rear axle. In claimant's words: "I seen the man sticking out from under the truck. . . . I walked up there, I could see him, and I'd see his head and everything was all mashed, and . . . (t)he rear axle . . . (i)t was on his head and chest . . . . I seen the man; I just . . . went in shock, and . . . I just . . . how in the word did anything like that could happen; and I just . . . felt so awful that I just went to crying and went over and set on a rock; and I waited until my dad come up there, and they asked me if I'd move the truck, and I told them I didn't want to drive the truck no more."

Confronted by this grisly scene, claimant immediately manifested severe emotional shock. He cried uncontrollably and shook so violently he could hardly sit still. Claimant remained at the quarry the rest of the evening, until his father came and took him home. He continued to cry until he passed off to sleep. He continued to tremble and shake throughout the rest of the day. That night he was unable to sleep at all because his mind was obsessed with the tragedy.

Prior to this occurrence claimant was a healthy, normal person, entirely free of nervous disorder. He slept soundly, had good appetite, was mentally well-adjusted, could concentrate on his work and had no anxieties. His family life was serene and he enjoyed his children. Since the occurrence he sleeps with difficulty and fitfully for periods of only thirty minutes or so. His sleep is disturbed by recurrent nightmares, dreams about "the thing that day—about his (Swift's) family and about him (as an occasional preacher) in church". These dreams frighten claimant. He wakes up shaking, perspiring, and feels like crying. His appetite has diminished and he has lost much weight. He has become sensitive to noise and no longer plays with the children.

A significant change has come about in the personality and demeanor of the claimant. He now has difficulty concentrating and has become distracted. There are times when people talk to him that he does not hear them because his mind is engrossed with thoughts of the occurrence. He cries when he thinks about the Swift family and that he is the cause of their bereavement. He no longer remembers well. Claimant has taken casual employment with a turkey processing plant, folding boxes, and with a steel company, painting joists. These attempts at employment were unsuccessful because he could not keep his mind on his work, could not concentrate,

and did not feel able to do the work. From the time claimant was eighteen years old to the date of the occurrence—a period of eight years—he had been a truck driver, as also were his grandfather, father and brothers. It had been his ambition to buy a truck of his own and operate it as his life-time occupation. Since the occurrence, the claimant has not driven at all except for two or three occasions when he drove his grandfather's truck to the creek, but that made him so nervous his grandfather had to take over the driving. The claimant's wife describes him as an unhappy person who bites his nails and "just goes off in dazes". He does not appear to understand her or respond to her. She recognizes that her husband has a nervous disorder and has modified the life of the family to adjust to the situation. The family has been able to subsist only because of help from his grandparents, father and aunt.

The only medical evidence in the case is the testimony of Dr. Alfred Owre, Jr. as a witness on behalf of the claimant. At the time of the hearing, Dr. Owre was a staff psychiatrist, instructor and director of forensic psychiatry at the Western Mental Health Center in Kansas City, which is the psychiatry department of the University of Missouri at Kansas City.

Dr. Owre examined the claimant on two separate occasions. The first examination was conducted on April 22, 1967, as a complete psychiatric evaluation of claimant. For that purpose the doctor took from claimant a history, in depth, of his personal and family background, his socio-economic functioning, his environmental factors, and his occupational experience, climaxed by the tragic accident which led to the condition under inquiry. During the entire interview the claimant cried almost incessantly, was quite agitated and appeared to be nervous. He presented himself as a person describing emotion-laden events with which he could not cope—"as a helpless person caught up in this problem and unable to do anything about it". According to Dr. Owre, the examination was a quite painful procedure for claimant. Dr. Owre testified that after claimant had narrated the harrowing details of the event which took the life of Mr. Swift, he elicited from claimant this "rather lengthy, rather sad list" of complaints of disability: (as stated by Dr. Owre) "First of all, he was unable to drive since—in the 18 months elapsed since the accident, which means he can't work as a truck driver. He can't drive on the highway. He briefly tried last winter to haul some hay with his pickup truck in back roads, but this was such a frightening experience that he had to give it up. He couldn't do it. So that then he became irritable, short with his wife, short with the children. He became grief-stricken, guilt laden, cried a lot, ate poorly, slept poorly, dreamt frequently of the accident, seeing in his dreams the face of his victim, and, in short, became a changed man."

Dr. Owre diagnosed claimant's disturbance as an anxiety neurosis or severe anxiety reaction. This condition was manifested by his inability to function in terms of driving, which had been the source of his livelihood; his nervousness, shortness with his family; his sleeplessness and obsessive dreaming about the event—all of which indicated that the anxiety brought about by the event remained an unresolved mental conflict.

On March 21, 1968, Dr. Owre again saw claimant and conducted a second full scale psychiatric examination, which revealed that claimant's pathology and symptoms had progressed and become more chronic. The second examination was even more difficult to conduct, and caused claimant more distress, than the first. The resulting diagnosis was essentially the same as the first one, that claimant had undergone psychiatric trauma and was suffering an anxiety reaction, or traumatic neurosis, described as severe and chronic, and manifested by anxiety, depression, guilt and remorse. "Psychiatric trauma" was defined by the witness as forceful injury to the

higher centers of the mind produced by emotion-laden events. "Anxiety reaction", the doctor explained, is a very real and crippling condition. It is just as real and disabling to a person suffering from such a condition as damage to any other part or system of the body. People afflicted with unresolved neurotic conflict are crippled in their functions socially, economically and in dealing with other human beings, sometimes to the extent of a virtual total disability. Claimant's condition had worsened since the first examination, and it was Dr. Owre's opinion that prognosis for claimant's recovery or improvement was less favorable than it was at the time he first saw him, because a year without treatment had intervened and "(t)he longer people remain sick, the more deep-seated their symptoms become and the harder they become to eradicate". Dr. Owre then gave this very relevant testimony:

"A. The 'physical structure' of a person includes the basic organ systems; it includes the limbs; muscles; the bones; the nerves innervating the muscles; the nerves from the brain that tell the nerves that go to the muscles what to do; it includes also the association tracts of the brain; it includes the anatomical sites of the sleep center, the appetite center, and so forth; and it includes anatomically the loci of the personality, the frontal cortex; it includes the motor cortex where motor movements originate; it includes the speech center—in other words, the body, the physical structure, it includes all these.

Q. In just kind of common, lay terminology, from the psychiatric medical point of view, does 'physical structure' include the mind?

A. Yes, we have localized this—the neurologists have—to the frontal cortex.

Q. Doctor, tell us, whether or not there can be an impact to the mind, mental process, or nervous system, of the human being without an actual physical touching of some part of the body.

A. Yes."

It was Dr. Owre's opinion to a medical certainty, based upon the facts in evidence, that there had been a disturbance, interference, harm or violence to the functions of claimant's nervous and mental system as a result of the September 14, 1966 occurrence; that the event of that date "broke" claimant and "drove him over the line into mental illness". Further, Dr. Owre stated, the event of September 14, 1966, did cause the conditions of disability which he found in claimant and that there was every reason to expect that claimant would have gone on working and functioning, coping adequately with his situation, had it not been for the occurrence of September 14, 1966. Based upon the facts of claimant's diminished economic productivity, Dr. Owre evaluated claimant's disability at 75% of the body as a whole.

In the majority opinion of the Industrial Commission the two concurring members concluded, with apparent reluctance, "were we free to exercise our discretion in the absence of a clear statutory definition of these terms ("injury" and "personal injuries") we would be compelled to find on the strength of the expert medical testimony contained in the record, that the employee did, in fact, sustain as a result of this gruesome discovery, a very real and disabling injury, although exclusively emotional in nature." The majority held, however, the provision of Section 287.020(3) that "(t)he term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body" expresses the clear statutory purpose to deny compensation for disability exclusively mental or emotional in nature. The majority opinion concluded that since claimant's disability was not "related to or connected with a physical trauma which is the result of some physical force upon the person," claimant had sustained no "violence" to the "physical structure" of his body as the statute defines those terms, he failed to prove a compensable injury.

The dissenting member, noting particularly the definition of the physical structure of the human body given by Dr. Owre, which testimony we have already re-scripted, concluded otherwise: "(M)edical experts have isolated the seat of the mind to the frontal cortex of the brain. Since the mind is controlled by the brain, what could be more logical than to conclude that the disability Todd sustained is the result of an injury produced by trauma incurred by Claimant Todd? Since there can be no denial that the brain as living tissue is a part of the physical structure of the body, I must therefore conclude that the injury in the instant case falls within the scope of the Workmen's Compensation Law." The respondent employer, citing Missouri cases [1], seeks to support the construction of the statute made by the Industrial Commission by drawing an analogy to the familiar common law rule that there can be no recovery in tort for negligence for nervous shock or other mental disturbance from fright, terror or anxiety, in the absence of some physical impact upon the body, however slight. This view is both atavistic and alien to the purposes for which the Workmen's Compensation Law was enacted. Workmen's compensation was created by the Legislature to remedy the harsh effects of inadequate recoveries by workmen against employers under common law tort doctrines and procedures.[2] Our workmen's compensation law rejects the common law defense of contributory negligence in favor of a theory of liability without fault. Section 287.120(1), V.A.M.S.—Scharlott v. New Empire Bottling Co., 354 Mo. 971, 192 S.W.2d 853, 855 [1, 2]. The compensation law does not supplement the common law but is wholly substitutional in character and creates entirely new rights and remedies. Sheen v. DiBella, Mo.App., 395 S.W.2d 296, 298 [3]. The benefits it provides are not reparations for injury as such, but for loss of earning power and disability from work, and, in the public interest, are intended to ameliorate the losses suffered by the workman and his dependents during his disability. American Oil Company v. Pierce, Mo.App., 472 S.W.2d 458, 462 [5, 6]. The law was intended, also, to establish a simple remedy for an injured workman to obtain definite and certain compensation for injuries arising out of and in the course of employment. Killian v. Sterling Aluminum Products Co., Mo.App., 227 S.W.2d 526, 532 (concurring opinion by McCullen, J.). To accomplish these highly remedial purposes, the Workmen's Compensation Law is to be construed liberally in a manner calculated to extend its benefits to the largest possible class and restrict those excluded to the smallest possible class. Albin v. Hendrich Brothers Implement Company, Mo.App., 382 S.W.2d 734, 738 [3]. This principle of construction extends to such operative statutory definitions as "injury" and "accident". Jacobs v. Bob Eldridge Construction Co., Mo.App., 393 S.W.2d 33, 35 [1]; Specie v. Howerton Electric Company, Mo.App., 344 S.W.2d 314, 315 [1].

1. Trigg v. St. Louis, Kansas City and Northern Railway Company, 74 Mo. 147; Pretsky v. Southwestern Bell Telephone Company, Mo., 396 S.W.2d 566.

2. R. Robert Cohn, History of Workmen's Compensation, Preface to Chapter 287, V.A.M.S., l. c. p. 17: "It was pointed out (in a brief presented to the 52nd General Assembly) that on the basis of 50,000 accidents reported in Missouri in 1921 (prior to the adoption by the people of Missouri of the first Workmen's Compention Law), it was estimated that one-half (of the accidents) were tabulatable and only ten per cent received some compensation. Of the tabulation 'it is a fair estimate that 25 per cent received anything in the nature of compensation under the common law and 75 per cent received nothing.' In the same year in a series of briefs submitted, it was pointed out that 25,000 employees were killed or injured in Missouri yearly from industrial accidents; that 80 per cent were not compensated at all and that the other 20 per cent received compensation but had to bear the expense and delay of litigation." See also: 70 Yale Law Journal 1129, "Workmen's Compensation Awards for Psycho-neurotic Reactions"; 11 Buffalo Law Review 376, "Workmen's Compensation and the Disabling Neurosis".

The Industrial Commission, having determined as a matter of law that a psychoneurosis caused by a mental stimulus, unrelated to any physical impact, is not a compensable injury, concluded that it was unnecessary to consider whether the event which precipitated claimant's disability was an accident within the meaning of the compensation law. While the focus of our review is the meaning intended by the statute to be given the term "injury", and not "accident", the statutory definitions of those terms, each of which relates to an accident-produced injury, are *in pari materia* and are to be construed together:

"(Section) 287.020. Definitions.

\*   \*   \*   \*   \*   \*

2. The word 'accident' as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury.

3. The terms 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom \*   \*   \*."

The statute does not require that the "accident" precipitating a compensable injury be a physical event. And an injury is produced "violently" within this definition of "accident" if the precipitating event is an efficient cause of the harmful result. Raef v. Stock-Hartis, Inc., Mo.App., 416 S.W.2d 201, 205 [6]. Also, the "objective symptoms of an injury" which characterize a compensable "accident" within the definition of Section 287.020 [2] " 'are not limited to external wounds, bruises, and the like which can be seen or ascertained by touch, but include as well all involuntary expression of pain or distress, such as weakness, faintness, pallor or sickness, indicating a deleterious change in the body condition' ". Davies v. Carter Carburetor, Division ACF Industries, Incorporated, Mo., 429 S.W.2d 738, 750 [12–14]; Albert v. Krey Packing Company, Mo.App., 195 S.W.2d 890, 893 [2].

The principle that a psychoneurosis is a compensable injury provided its causal connection with the accident is proved by clear evidence was established in Missouri by Thompson v. Railway Express Agency, Mo.App., 236 S.W.2d 36, 39 [2] and has been followed since. See, Ceback v. John Nooter Boiler Works Co., Mo.App., 258 S.W.2d 262, 265 [4]; Boatright v. ACF Industries, Mo.App., 463 S.W.2d 549, 551 [1]; Greer v. Black, Sivalls & Bryson, Inc., Mo.App., 483 S.W.2d 763, 766 [1]. In Missouri decisions where compensation for psychoneurosis was denied, the principle established by *Thompson* was cited with approval, but it was determined that no causal relationship between the accident and mental disability was proven. Wilhite v. Hurd, Mo., 411 S.W.2d 72, 78 [5, 6]; Patane v. Stix, Baer and Fuller, Mo.App., 326 S.W.2d 402, 413 [2]. In each of these decided cases, however, whether compensation was allowed or denied, the psychic disability was claimed to be the result of a physical accident or related to a physical trauma. The claim which appellant Todd makes, therefore, that his emotionally-induced psychoneurosis is compensable, is one of first impression in this state.

Among the jurisdictions which have considered the question, Larson[3] discerns "a distinct majority position supporting compensability in these cases". These decisions take the view that, even in the absence of physical impact, there is "accidental injury" or "personal injury" within the workmen's compensation acts where an employee suffers a nervous disability from sudden shock, fright, or other emotional

3. Larson's Workmen's Compensation Law, Section 42.23. See also: 23 Vanderbilt Law Review 1243, Nov. 1970. Larson "Mental and Nervous Injury in Workmen's Compensation", l. c. 1251.

stimulus. Annotation, 109 A.L.R. 892. Among the earliest domestic decisions[4] adopting this rule of compensability was Klein v. Len H. Darling Co., 217 Mich. 485, 187 N.W. 400 (1922). In that case, compensation was awarded for the death of a workman which resulted from a delirium caused by the shock of having let fall a radiator on the head of a fellow employee. In finding an accidental injury under this evidence, the court observed, l. c. 403:

"An accident happened in which the deceased was an actor; and the shock to him was so acute and so depressed his vital forces as to kill him. We must not overlook man's nervous system and mental makeup and their intimate relation to his vital forces.

"This man died because his vital forces could not meet and withstand the acute depression occasioned by what he had done in the course of his employment. The injury to him was no less real and fatal in its consequences than a mortal wound."

In Burlington Mills Corporation v. Hagood, 177 Va. 204, 13 S.E.2d 291 (1941), compensation was awarded for a disabling neurosis which resulted from a sudden fright caused by an electric flash when a nearby motor short-circuited. The court rejected the argument the respondent employer here also makes, that there is no compensable "accidental injury" within the compensation law in the absence of a physical impact, and in doing so, quoted with approval the holding in Klein v. Len M. Darling Company, *supra*. The court determined that it accords with the beneficent

purposes of the compensation law to attribute to the term "injury" a meaning which includes, l. c. 293, "whatever lesion or change in any part of the system produces harm or pain or a lessened facility of the natural use of any bodily activity or capability".

In Charon's Case, 321 Mass. 694, 75 N. E.2d 511 (1947), the employee suffered from a conversion reaction in the form of a paralysis of her left side as the result of fright occasioned by a loud noise and flash of light created when lightning struck the building in which she was working. The question was once again whether there could be a "personal injury" within the compensation law in the absence of a physical impact. The court determined that it was within the ameliorative purposes of the workmen's compensation law that, l. c. 513, "a personal injury due entirely to nervous shock, fright or terror (be) a compensable injury". This rule of compensation has been followed by numerous other jurisdictions as falling within the "personal injury" intendments of their compensation statutes: Geltman v. Reliable Linen & Supply Co., 127 N.J.L. 487, 23 A.2d 272 (1941), aff'd 128 N.J.L. 443, 25 A.2d 894 (1942); Lyng v. Rao, 72 So.2d 53 (Fla. 1954); Kinney v. State Industrial Accident Commission, 245 Or. 543, 423 P.2d 186 (1967); Brock v. The Industrial Commission, 15 Ariz.App. 95, 486 P.2d 207; Baker v. Workmen's Compensation Appeals Board, 18 Cal.App.2d 852, 96 Cal.Rptr. 279.[5]

In Bailey v. American General Ins. Co., 154 Tex. 430, 279 S.W.2d 315, the Supreme Court of Texas determined that a neurosis

---

4. This rule of compensation was first articulated by the English court in Yates v. South Kirby & Co. Collieries, Ltd. (1910), 2 K.B. 538. A mine worker who developed a disabling psycho-neurosis after aiding a dying fellow employee was awarded compensation.

5. A comprehensive summary of the jurisdictions which have adopted this rule of compensation is found in Larson's Work-

men's Compensation Law, Section 42.23. This summary is repeated and made current in 23 Vanderbilt Law Review 1243, November, 1970, Larson, "Mental and Nervous Injury in Workmen's Compensation", and Appendices I through VI, pp. 1261–1275. The decisions holding *per contra* are also collated. See, also, the cases listed in Blair, The Reference Guide to Workmen's Compensation, Sec. 6:12, and cumulative supplements.

suffered by a structural steel worker solely as the result of fright was compensable under a statute defining "injury" as "damage or harm to the physical structure of the body". The claimant and a fellow worker were on opposite ends of a movable scaffold when one end gave way. The claimant saw his fellow workman plunge to his death and thought he himself was about to be killed, but he managed to jump to safety on the roof of the adjacent building. After this episode, he was unable to resume his employment, although he had trained for it all his life and had become a skilled worker. He could not concentrate on his work and was affected by a terror of impending doom and experienced frozen paralysis when he tried to work at a considerable height. He no longer qualified as a structural steel worker. There was agreement in the testimony that claimant's body no longer functioned properly.

The insurer contended that the statutory term "physical structure of the body" meant a grouping of the several bodily parts—such as bones, tissues and nerves—and that an "injury" within that meaning required a lesion or gross alteration of these parts. The court rejected this contention of "dichotomy between 'mind' and 'body'", 1. c. 319(3), and determined that claimant's neurosis was an "injury" within the statutory definition, 1. c. 318 [2]:

"The phrase 'physical structure of the body' as it is used in the statute, must refer to the *entire* body, not simply to the skeletal structure or to the circulatory system or to the digestive system. It refers to the *whole*, to the complex of perfectly integrated and interdependent bones, tissues and organs which function together by means of electrical, chemical and mechanical processes in a living, breathing, functioning individual. To determine what is meant by 'physical structure of the body', the structure should be considered that of a living person—not as a static, inanimate thing."

It is to be noted that the statutory definition of "injury" construed by the Texas court is the substantive equivalent of the definition of that term in the Missouri workmen's compensation law. Given in juxtaposition, "injury" and "personal injury" are defined as:

In Texas Article 8309(5):

"damage or harm to the physical structure of the body".

In Missouri Section 287.020(3):

"violence to the physical structure of the body".

It was judicially determined in Raef v. Stock-Hartis, Inc., Mo.App., 416 S.W.2d 201, 205, that "violently" as used in the Section 287.020(2) definition of an injury-producing "accident" means a cause which produces "a harmful result", that is, harm. When we interpolate "harm" for "violence" in the Missouri definition of "injury" (to be understood *in pari materia* with the definition of injury-producing "accident"), it becomes an identical rendering of the Texas statutory definition of that term.

Another jurisdiction, Idaho,[6] has awarded compensation for death and for disabling neurosis caused by emotional shock, without physical impact, under a statute which requires "violence to the physical structure of the body". In Roberts v. Dredge Fund, 71 Idaho 380, 232 P.2d 975

---

6. Louisiana, also, requires "violence to the physical structure of the body" for a compensable injury. Peavy v. Mansfield Hardwood Lumber Co., 40 So.2d 505, a 1949 decision of the Second Circuit of the Court of Appeal of Louisiana, allowed compensation for a neurosis without palpable anatomical pathology. Although Peavy has not been expressly overruled, yet the decision of the Louisiana Supreme Court in Danziger v. Employers Mutual Liability Ins. Co. of Wisconsin, 245 La. 33, 156 So.2d 468 (1963) and numerous decisions of the First, Third, and Fourth Circuits of the Court of Appeal of Louisiana raise doubt whether the Peavy rule is authoritative in Louisiana.

(1957), a dredge employee was killed by the stoppage of his heart resulting from shock to his nervous system from an explosion, loud noise, and large ball of fire which attended the short circuit of a transformer fuse. In allowing compensation under the "violence to the physical structure of the body", definition, the court adopted the reasoning of the dissent in Bekeleski v. O. F. Neal Co., 141 Neb. 657, 4 N.W.2d 741 (construing an identical statute) as more scientific and more worthy of acceptance, l. c. 744:

> " . . . . I am inclined to think that the lawmakers, by the use of the term 'violence to the physical structure of the body,' meant an animate body with a directing brain containing blood, sensitive nerves, fibers and convolutions. The brain is part of the physical structure of the body. Without it there could be no performance of an employee's duties. Accidental violence to the brain and resulting disability may be difficult to prove, but plaintiff was rational before the accident and irrational afterward. Her blood pressure was higher and her pulse more rapid. The pupils of her eyes were dilated and her posture abnormal. She had tremors and was unable to walk in her usual manner, all as properly indicated by the majority opinion, but it seems to me these results of the accident evidence 'violence to the physical structure of the body,' within the meaning of the compensation law."

The Supreme Court of Idaho concluded from the medical evidence that "violence to the physical structure of the body" of the workman was done when his heart stopped beating from the occlusion of a coronary artery. The court quoted with approval, l. c. 980, from J. Norman Geipe, Inc. v. Collect, 172 Md. 165, 190 A. 836 (1937):

> " 'It is not perceived that there is any fundamental difference in law or in principle between an injury causatively resulting from a blood vessel being cut or crushed and one broken by an artificial distension of that blood vessel from fright, apprehension, or exertion directly and proximately a consequence of an accidental event.' "

In Miller v. Bingham County, 79 Idaho 87, 310 P.2d 1089 (1957) the Idaho Supreme Court reaffirmed its prior holding that an emotional shock resulting in nervous disability is a compensable injury by allowing compensation to a workman who suffered a cerebral hemorrhage which produced a paralysis of his arm from fright when he was almost involved in a serious automobile accident.

These authorities persuade us, under any of the definitions of "injury" considered, that the broad objective of workmen's compensation to compensate workers for injuries arising from the increased risks of modern industrial society can be effectively accomplished only if the distinction between physical and mental injury—no longer medically tenable—is discarded in determining compensability.

We are persuaded also by these authorities as well as by the developments in our own jurisprudence and the record in this case, that claimant Todd's emotionally-induced neurosis was "violence to the physical structure of the body", and therefore a compensable injury. The majority members of the Industrial Commission, while reserving the question of accident, conceded the disabling neurosis and that it was caused by the emotional shock of the claimant's gruesome discovery, yet determined that there could be no compensable injury within the statutory definition because "violence to the physical structure of the body" requires that the disability be related to a physical impact or trauma. In this they erred on a matter of law.

Section 287.020(3), which defines a compensable "injury" does not in terms or by implication require that the disability be occasioned by a physical impact. The only Missouri case which construes this

statutory definition supports our conclusion. In Rinehart v. F. M. Stamper Co., 227 Mo.App. 653, 55 S.W.2d 729, l. c. 732 [6], it was determined that a workman who had been unduly exposed to extreme cold while working in a refrigerator, from which he contracted pneumonia, had suffered "violence to the physical structure of the body", and thus a compensable injury. As we have noted, our appellate courts have also determined that the objective symptoms required by Section 287.020(2) for a compensable injury need not be palpable wounds and bruises, but include " 'all involuntary expression of pain or distress, *indicating a deleterious change in the body condition' "*. Davies v. Carter Carburetor, Division ACF Industries, Incorporated, Mo., 49 S.W.2d 738, l. c. 750 [12–14] (Emphasis supplied). Since the definition term "violence" must be read as "harm", if the evidence proves claimant's harmful, disabling neurosis was a condition of the physical structure of the body (and assuming proof of accident), a compensable injury is shown.

The psychiatric testimony given by Dr. Owre, uncontradicted on this record, was that the physical structure of the body includes the basic organ systems, as well as the brain and mind—itself anatomically sited in the frontal cortex—functioning "as an integrated whole, chemically, electrically, biochemically", and that there can be an injury to the mind without a physical touching of some part of the body. It was Dr. Owre's testimony that the emotional shock of discovering Swift's lifeless body under the wheels of the truck was a psychiatric trauma, or injury to Todd's mind, resulting in an interference of the functioning of the nervous system and of the control of the mind over the body. This interference of function or "anxiety neurosis", is as susceptible of medical diagnosis as is a fracture and is as real and crippling an incapacity as that resulting from a "physical" injury. This anxiety neurosis, manifested by feelings of guilt and remorse, has reduced Todd from a condition of sound health, ambition and economic productivity to one of physical inability to drive his truck and thus provide for his family, so that he has become a pathetic object of charity. Except for the occupational event of September 14, 1966, Todd would still be functioning normally, carrying on his usual work. This undisputed evidence conclusively proves that Todd's crippling neurosis precipitated by emotional shock was harm to the physical structure of his body, and therefore an injury, within the definition of Section 287.020(3).

The respondent employer contends that in those cases where compensation has been allowed for nervous injury from emotional stimulus there was present the threat of physical injury or violence to the workman and that it was the fear of the workman for his own life, an element missing here, which produced the compensable neurosis. Without conceding the validity of this argument, the only requirement of our statute is that there be harm to the physical structure of the body; it does not say what the precise cause for that injury shall be. The restriction respondent would impose upon compensability of such injuries is unrealistic. The origins of industrial injuries are too diverse and too uncertain to allow such artificial limitations. The law should not discard one fiction—the duality between body and mind—only to supplant it by another.

The judgment is reversed and the cause is remanded to the circuit court with directions that it be remanded to the Industrial Commission for further proceedings consistent with this opinion.

All concur.

PRITCHARD, SWOFFORD and WASSERSTROM, JJ., not participating because not members of the court when cause was submitted.